WILLIAM WHEELER, APPELLANT, v. HUGH SMITH AND PHINEAS JANNEY, EXECUTORS OF CHARLES BENNETT, DECEASED, AND SURVIVING TRUSTEES UNDER HIS WILL, AND MOLLY E. TAYLOR, EXECUTRIX, AND HENRY DAINGERFIELD AND PHINEAS JANNEY, EXECUTORS OF ROBERT I. TAYLOR, DECEASED, WHO WAS AN EXECUTOR AND TRUSTEE UNDER THE SAME WILL, HUGH C. SMITH, EXECUTOR OF THE SAME CHARLES BENNETT, AND THE COMMON COUNCIL OF ALEXANDRIA, DEFENDANTS.

The statute of 43d Elizabeth, respecting charitable uses, having been repealed in Virginia, the courts of chancery have no jurisdiction to decree charities where the objects are indefinite and uncertain.

Therefore, where a bequest was made to trustees for such purposes as they considered might promise to be most beneficial to the town and trade of Alexandria such bequest was void.

Where the heir at law, who was young, needy, and hurried, executed a release, in consideration of a sum of money, to the executors, who were men of high character, and who assured the heir that the bequest was considered to be good, such release was held to be invalid.

THIS was an appeal from the Circuit Court of the United States for the District of Columbia and County of Alexandria.

It was a bill filed by Wheeler under the following circumstances. He was the nephew of Charles Bennett, who died in 1839, leaving neither father nor mother nor brothers nor sisters, nor any descendant of any brother or sister except Wheeler, who, as above stated, was his nephew. Previous to 1839, he had been assisted by his uncle, but had fallen into bad and extravagant habits, and removed to the State of Pennsylvania. Bennett had placed some land and $20,000 in the hands of two trustees for Wheeler's benefit.

In this state of things Bennett died, leaving a will from which the following are extracts, viz. : —

"15th. To Francis E. Rozer and John M. Lisle I leave the direction of all relating to William Wheeler. I have vested with the latter the funds intended for his use, in consequence of being obliged to take possession of his estate and blend it with my own; he is at liberty, and is enjoined, whenever he considers said William may be safely trusted, to give him possession of all left for his use. The landed estate I wish preserved if it can be ; it stands deeded in the name of Francis E. Rozer and John M. Lisle, and is under the management of John I. Jenkins, in Charles County, Maryland. Having come through William's family two hundred years ago, I should regret its not continuing."

"20th. The residue of my estate is left in trust of Hugh Smith, Robert I. Taylor, and Phineas Janney, for such purposes as they consider promises to be most beneficial to the

town and trade of Alexandria; if any difficulty occurs in construction as to any of my bequests, R. I. Taylor is specially charged to give said construction."

Then followed several papers in the nature of codicils, one of which was as follows:—

"Now in the inclosure I leave the residue of my estate, after paying all bequests and appropriations, to some disposition thereof which my executors may consider as promising most to benefit the town and trade of Alexandria. Now I leave the same entirely to their disposition of it, in such manner as appears to them promises to yield the greatest good.

"CHARLES BENNETT. [SEAL.]"

The will, with seven codicils, was admitted to probate on the 4th of May, 1839, and letters testamentary granted to Hugh Smith, Robert I. Taylor, and Phineas Janney, named as executors in the will. At the same time were filed the following release and receipt:—

"Whereas, Charles Bennett, Esq., late of Alexandria, deceased, by his last will and testament, after bequeathing sundry pecuniary legacies, devised as follows:— 'The residue of my estate is left in trust of Hugh Smith, Robert I. Taylor, and Phineas Janney, for such purposes as they consider promise to be most beneficial to the town and trade of Alexandria; if any difficulty occurs in construing as to any of my bequests, R. I. Taylor is specially charged to give the said construction'; and in a codicil to his said will expresses himself as follows:— 'Now, in the inclosure, I leave the residue of my estate, after paying all my bequests and appropriations, to some disposition thereof which my executors may consider as promising most to benefit the town and trade of Alexandria. Now I leave the same entirely to their disposition of it, in such manner as appears to them promises to yield the greatest good.' And whereas the validity of the said devise and bequest has been controverted by William Wheeler, now of Chester County, in the State of Pennsylvania, claiming to be the nephew and sole heir of the said Charles Bennett. Now the said executors, taking on themselves the burden of the execution of the said will, and of the trusts aforesaid, and the said William Wheeler, to avoid the delay and expense of litigation, and finally to settle and adjust all doubts and difficulties which might arise on the effect of the said will, so as to leave the said executors to execute the same without delay or impediment, have agreed on the following terms of compromise.

" 1st. That the said executors shall, within one year from the date hereof, at all events, or sooner if funds in cash remain in their hands, after the payments of the money legacies bequeathed by the said will, pay to the said William Wheeler, or his order, the sum of twenty-five thousand dollars. 2dly. That they shall release to the said William Wheeler all claims, if any they have, to any property, real or personal, heretofore conveyed or settled in any way by the said Charles Bennett, in his lifetime, for the use of the said William Wheeler. 3dly. That the said William Wheeler, on his part, shall release to the said executors all his claims, in law or equity, to the estate, real and personal, devised and bequeathed, or intended to be devised or bequeathed, by the said Charles Bennett, by his said will, to be held and disposed of by the said executors in the manner in and by the said will prescribed. And that the said executors shall be at liberty, if any specification of the objects to which the residuary fund is to be applied be thought necessary, to apply the same to aid in finishing the Alexandria Canal, either by a direct subscription to its stock, or by purchasing in the stock of the Alexandria Corporation issued or to be issued in payment of the subscription of the said corporation to the said canal; to the extinguishment of the debt of the Corporation of Alexandria; to introduce into the town, for the use of the inhabitants, a supply of pure and wholesome water; and to subscribe to any railroad or other roads communicating with the said town; to any or to all of the above purposes in such way as the said executors or the survivors may think most conducive to the prosperity and welfare of the town. Now, therefore, the said executors do hereby covenant with the said William Wheeler, that they will, within twelve months from the date hereof, or sooner if cash funds remain after paying the pecuniary legacies, pay to him or his assigns the sum of twenty-five thousand dollars. And the said executors do hereby for ever release to the said William Wheeler, his heirs and assigns, all claims and demands they have or may have hereafter under the said will to any estate, real and personal, heretofore given, settled, or conveyed by the said Charles Bennett, in his lifetime, to the said William Wheeler, or to any person or persons in trust for him, and more especially to twenty thousand dollars stock of the State of Pennsylvania, standing in the name of John Lisle and John K. Mitchell, for the use of the said William; and they do, moreover, covenant to execute and deliver all further deeds, or other instruments necessary to carry into effect this arrangement. And the said William Wheeler does on his part hereby for ever release to the said executors all his right, title, claim,

and demand in and to all the estate, real and personal, devised or intended to be devised by the said Charles Bennett, by his said will, for the purposes expressed in his will, with power to the said executors to appropriate the residuary fund as before specified, if any particular designation of the purposes be necessary. And the said William Wheeler, for himself and his heirs, does hereby covenant with the said executors and their representatives to execute and deliver all such further deeds of conveyance and release as may be found necessary more fully to carry into full effect this agreement.

"In witness whereof, the parties to this instrument have hereto set their hands and seals, this 4th day of May, 1839.

"WM. WHEELER. [SEAL.]
HUGH SMITH. [SEAL.]
R. I. TAYLOR. [SEAL.]
PHINEAS JANNEY. [SEAL.]

" Sealed and delivered in presence of
　　　　ROBERT H. MILLER,
　　　　WM. H. FOOTE,
　　　　JAS. MILLAN."

" Received from Hugh Smith, Robert I. Taylor, and Phineas Janney, executors of Charles Bennett, deceased, five thousand dollars, in part payment of the sum covenanted to be paid by the above agreement. May 4th, 1839.

" [$ 5,000.]　　　　　　　　　WM. WHEELER."

The circumstances under which the above release was executed are thus stated in the bill of the complainant, Wheeler: —

" At the time of his uncle's death, in April, 1839, your orator resided, as he does at present, in Chester County in Pennsylvania, in very cramped and straitened circumstances. It is true that the income settled upon him by his uncle was sufficient, with proper economy, to afford him a comfortable and independent subsistence. But he found it difficult, nay, impracticable, to divest himself entirely of those expensive habits which he had formed while he was presumptive heir and expectant of great wealth; for Mr. Bennett's wealth, as is usual in such cases, was considerably overrated.

" Whatever was the cause of his embarrassments, however, the fact was as he has stated, and is susceptible of the most ample proof. Whether the fact of his necessitous condition had come to the knowledge of his uncle's executors, through Mr. James R. Riddle, of Alexandria, with whom your orator kept up a correspondence, he does not know. He thinks it more than

probable; and he charges such knowledge, so far as it is necessary to make such charge, in order to let in evidence of the fact.

"Such was his situation when, about the end of April, 1839, he received a letter from Mr. Riddle, written at the instance of the executors, informing him that his uncle had died on the 24th of that month, that his will would be offered for probate in the Orphans' Court of Alexandria on the 4th of May, and that the presence of your orator on, that occasion, as next of kin and heir at law of the decedent, was desirable, or was necessary. He received by the same mail the Alexandria Gazette, in which it was stated that Mr. Bennett, having made provision for his immediate relations in his lifetime, had left a will, by which, after giving a number of legacies to his friends, &c., he had devised the residue of his property to the town of Alexandria. The letter of Mr. Riddle is lost or destroyed, and your orator cannot recollect its precise date, or the precise day on which it was received; but he well recollects that the notice given to him was very short, and that the difficulty of reaching Alexandria, on so short a notice, was enhanced by his moneyless condition, and the necessity of borrowing $50 to defray the expenses of the journey. With all the exertion he could make, it was noon on the 2d of May before he arrived at Alexandria.

"He quickly communicated to Mr. Riddle, who handed to him on his arrival a copy of his uncle's will, his determination to contest the validity of the residuary devise. In an interview which he had, on the same afternoon, with Hugh Smith, Esq., one of the executors, that determination, which had been communicated to Mr. Smith by Mr. Riddle, was the subject of conversation. At that interview Mr. Smith manifested a kindly feeling towards your orator, and appeared to be almost nervously anxious that a lawsuit should be avoided. He did not, however, express any fears about the result. On the contrary, he stated that the executors had consulted counsel, whose opinion was in favor of the validity of the whole will, and seemed to have entire confidence in the correctness of the opinion. But he intimated, delicately, that the executors entertained a friendly feeling for your orator, and were disposed to act liberally with him; and admitted that they greatly deprecated the delay which would attend a litigation. He spoke much and earnestly about the inevitable delay and vexation of a suit. He said that a smart and ingenious lawyer could pick a hole in almost any instrument of writing. That no doubt such an one could be found who would undertake

your orator's case, and then the will would be thrown into chancery, where it would remain for years. Your orator remarked that, at that time, he was not able to fee a lawyer, but that he could obtain assistance from his friends. Mr. Smith proceeded to say, that he thought a course might be taken by which expense and delay might both be avoided. He suggested, in short, that the executors were willing to pay a sum of money to your orator for a release of all claims on the estate, and proposed a conference between your orator and all three of the executors on the forenoon of Friday, the 3d of May, at the late residence of Mr. Bennett, which was accordingly appointed to take place.

"The amount which the executors were disposed to give for a release was not specified at the preliminary interview; but your orator learned, from a credible source, after the release had been executed, and the will had been admitted to probate, that the executors had at that time, and before the arrival of your orator, determined to offer him ten thousand dollars, and no more. He also learned from the same source, and at the same time, that the executors (or some one or more of them, your orator cannot recollect which) had called upon him (your orator's informant) before your orator's arrival, to learn his character; and that (he or) they seemed to be impressed with the belief that your orator was of an easy disposition, and not over smart or intelligent, and that he would gladly accept their offers at once. Your orator's informant added, that to undeceive them he read to them parts of your orator's correspondence with him.

"At the conference of May 3d, at which were present the three executors, Mr. Riddle, and your orator, and no other person, your orator very briefly stated, in substance, that his opinion or impression was that the residuary devise in the will was void, and that he had determined to test its validity by legal proceedings. On the part of the executors, Mr. Taylor was the principal and almost the only spokesman.

"He insisted much on sundry written opinions of counsel in favor of the legal validity of the residuary devise, which he offered to show to your orator. He conveyed to your orator's mind (but by what language or phrases he cannot recollect) the clear and distinct impression, that there was but one opinion among the lawyers consulted on this question, or, in other words, that they were unanimous in favor of the legal validity of the residuary devise. But as Mr. Taylor had not stated that he concurred in opinion with the counsel whom the executors had consulted, and as your orator regarded him as counsel of

Wheeler *v.* Smith et al.

the highest legal ability, he (your orator) asked him, without ceremony, what his opinion was on the subject.

"His reply was, that your orator ought not to have asked his opinion; but as he had been asked, he would give it. The substance and effect of his opinion was, that the devise in question was a legal and valid disposition of the residue of the estate. When your orator, now greatly disheartened, intimated deferentially that he had taken up a contrary opinion, Mr. Taylor said that he admitted that in Pennsylvania such a devise would not be good; but that it was good under the old law of Virginia, as it existed at the time of the cession of the County of Alexandria by Virginia, which law was the law of the County of Alexandria up to the time of Mr. Bennett's death.

"But while an undoubting confidence was expressed by the executors, through Mr. Taylor, in the ultimate result of any litigation about the validity of the residuary devise, they admitted, and accounted for their anxiety to obtain an immediate release of your orator's claim, by insisting on the great importance to the town of Alexandria of an *immediate* application of the residuary fund to the completion of the canal, more especially, and to other useful and important objects. To avoid the delay of a lawsuit, they were willing to pay for a release of your orator's claim, however untenable and desperate. Your orator does not mean here to quote the language of Mr. Taylor, but to state the impression made on his mind by the language used.

"It were tedious to tell much more that was said at this conference. Suffice it to say, that Mr. Taylor was a man of commanding intellect; and that, under the most favorable circumstances, your orator would have been wholly unequal to the intellectual conflict in which he found himself involved with one so gifted, and for whom he entertained an habitual and profound respect. But having no distinct or settled views of the legal question thus suddenly forced upon him, or time to form any, fevered by a rapid journey, his spirits depressed by the recent death of his last kinsman, to whom he had been tenderly attached, and flurried and confused by the magnitude of the question he was called on to decide, and the necessity of deciding it at once, your orator felt himself wholly overpowered, and strongly inclined to succumb to the views so forcibly presented to him. And these views were moreover recommended to his favorable consideration by the offer, so tempting to a man in his situation, of a large sum of money, without delay or further trouble.

"In this state of mental ferment, your orator, scarcely know-

ing what to do or say next, asked the executors what sum they proposed to give him for a release. They answered that it was for him to say what he would be willing to take; and the conference closed with a request on the part of the executors, that your orator would consider the matter, and let them know his decision in the course of the day.

" But how could he, in the time allowed him, give to the subject the consideration its importance deserved, or any consideration? His personal incompetency to decide the question, or even to consider the subject in so short a time, he has already stated truly, and without exaggeration. He was so much flurried that his mind could not act. Why not, then, resort to learned and able counsel, having no personal interest in the question, for advice and direction? The answer is, that the executors, by the shortness of the notice which they had given him, or, in other words, by appointing so early a day for the probate, had effectually precluded him from pursuing this obvious and only rational course. A brief reference to the facts of the case will show conclusively the correctness of this assertion.

" It was now past noon on the 3d of May, and your orator was given to understand that on the next day the will would and must be offered for probate. Counsel was, in the mean time, to be sought for in Alexandria, where the whole population was interested in sustaining the will, and where, without derogating from the professional merit of the rest of the bar, it may be said that the first jurist of the town was committed against him. And if it be conceded that good counsel could have been had in Alexandria, it is still perfectly obvious that he could not have had time to examine and give an advised opinion on a question involving above one hundred thousand dollars; and, if not one of great difficulty, still one requiring a very great and deliberate consideration. No counsel would have taken on himself the responsibility of giving a final opinion on such a question in the time that was allowed to your orator for his decision. He was therefore compelled to decide, without the aid of counsel, whether he would make the legal validity or the legal invalidity of the devise the basis of his action; and being entirely in the dark, he concluded that the only safe course was to consider the devise valid, and take what he could get for a release. But he was required to name a sum, and *what* sum he should name and demand was the remaining question.

" And here, again, such was the precipitation with which this important business was conducted, that he had no certain prem-

ises on which to act; for he had neglected to ask the executors, and they had not informed him, what would probably be the amount, after deducting legacies and expenses of administration, of the residuary interest which he was asked to surrender; so that, while he was apparently offered an election whether to go for the whole, or to take some definite amount in lieu of his chance of getting the whole, it was an election between a known quantity and an unknown quantity. That is to say, it was no election at all, but a mere proposition that he should guess what sum he would be content to receive, or at what point he ought to take his stand, and refuse to fall lower in his demands. Under this duress of circumstances he made a guess, and informed the executors in the course of the day that he would release his claim for $ 30,000. Their reply was an offer of $ 20,000, an answer to which was required on the following morning, the day of probate. In the morning of the following day, your orator called on Mr. Smith, and told him that 'he would be better satisfied with $ 25,000.' The executors agreed to give that sum, and so the matter ended.

"The agreement between your orator and the executors was forthwith committed to writing and executed, that is to say, signed and sealed by the parties. A certified copy is herewith presented, as a part of this bill."

The bill then proceeded to account for the delay in bringing the suit, and concluded in the usual form.

The bill was filed in May, 1844.

In January, 1845, the defendants demurred to the bill.

In October, 1846, the complainant filed an amended bill, making the Common Council of Alexandria a defendant. The Circuit Court, upon argument, sustained the demurrer, and dismissed the bill, from which decree an appeal brought the case up to this court.

It was argued by *Mr. James M. Mason* and *Mr. Cooke,* for the appellant, and *Mr. Davis* and *Mr. Coxe,* for the appellees.

*Mr. Mason* contended, —

1st. That the codicil which has been inserted in the statement was designed to revoke the 20th clause of the will, which clause mentioned the town and trade of Alexandria, whereas the codicil left it entirely discretionary with the trustees to apply the fund in any manner which promised to "yield the greatest good"; in which case no lawyer, who values his reputation, would venture to express the opinion that such a devise could be enforced by a court of chancery, either on the general principles of trusts, or under the law of charities, supposing

that law to have been in force in the County of Alexandria when the will took effect.

Conceding, however, hypothetically, that the codicil was but a senseless reiteration of the devise in the will, let us proceed to inquire into the validity of that devise.

And on this point, the appellant submits, in the first place, that the devise in the will (and *a multo fortiori,* the devise in the codicil) creates, or attempts to create, a trust which is void for uncertainty, and one which a court of chancery will not and cannot enforce, on the general or ordinary principles of trusts.

In support of this proposition, the following authorities are relied on.

2 Story's Equity, title *Trusts,* § 979, *a*; Ibid. § 979, *b*; Stubbs *v.* Sargon, 2 Keen, 255; Ommanney *v.* Butcher, 1 Turner & Russell, 260, 270, 271; 2 Story's Equity, §§ 1071, 1072, 1073, 1156, 1157, 1183, 1197, *a*; Wood *v.* Cox, 2 Mylne & Craig, 684; S. C., 1 Keen, 317; Fowler *v.* Garlike, 1 Russ. & Mylne, 232; Gallego *v.* Attorney-General, 3 Leigh, 450; Morice *v.* Bishop of Durham, 10 Vesey, 542; Attorney-General *ex relat.* of the Inhabitants of Clapham *v.* Hower, 2 Vern. 387; Parish of Great Creaton, 1 Ch. Ca. 134.

But it is supposed that the appellees have little confidence in their first point, namely, that the devise in the will is sufficiently certain to be carried into effect by a court of equity acting on the general principles of trusts, and that, driven from that point, they will fall back on the position that the devise is valid under the doctrine of charities.

The appellant, on the other hand, will insist on the counter proposition, that neither of the devises (that in the will, or that in the codicil) is a charitable devise at all, according to the law of charities as it exists in England, and in some of the American States, and therefore cannot be aided as such.

Conceding (on the authority of Vidal *v.* Girard's Executors, 2 How. 127,) that the Court of Chancery in England, before the statute of 43d Elizabeth, and consequently on common law principles, exercised the power of aiding vague and defective grants and devises, when made for charitable purposes, it will be shown by authority too strong to be shaken, that the Court of Chancery will not aid any vague or imperfect devise or grant, as a charity, unless it be one of those enumerated in the statute 43d Elizabeth, to the exclusion of all objects and purposes which are not enumerated, or come within the purview of the enumerated charities, or some one of them, or be for " charitable purposes *eo nomine*."

These adjudications rest on the assumption that the enumeration of charities in the statute recites and comprehends all the charities that existed, or were recognized, at common law. This is tantamount to the proposition, that no defective or vague devise will be aided, under the doctrine of charities, unless the property or fund granted or devised be exclusively limited and devoted to purposes charitable within the statute. That if any other purpose be mentioned, or deducible by inference along with the charitable purpose, or if the devise be in such terms that the property or fund may be applied to any purpose not within the statute, the court will not aid it. And it will be seen that these doctrines are fatal to the devise made by Charles Bennett's will; because it does not appropriate the trust fund exclusively to the purposes enumerated in the statute, or to purposes within the purview of those enumerated, but is broad and comprehensive enough to authorize the trustees to employ the fund in many ways without the scope of the statute.

The authorities which are relied on to sustain this position are as follows.

2 Story's Equity, § 1160, containing an enumeration of the charitable uses recognized by the statute; Ibid. § 1155; 2 Roper on Legacies, by White, c. 19, § 1, pp. 111, 112; Morice v. Bishop of Durham, 9 Vesey, 399; S. C., 10 Vesey, 522; Brown v. Yeall, 7 Vesey, 50, note (a); Moggridge v. Thackwell, 7 Vesey, 36; Attorney-General v. Bowyer, 3 Vesey, 714, 726; Coxe v. Bassett, 3 Vesey, 155; 2 Story's Equity, §§ 1156, 1157; Ommanney v. Butcher, 1 Turn. & Russ. 260, 270; 2 Roper on Legacies, by White, c. 19, § 6, pp. 215, 222; Vesey v. Jamson, 1 Sim. & Stu. 69; Williams v. Kershaw, cited in 1 Keen, 232; Ellis v. Selby, 1 Mylne & Craig, 286, 298, 299; also James v. Allen, 3 Merivale, 17, cited in Ellis v. Selby; 2 Story's Equity, §§ 1158, 1183; Trustees of Baptist Association v. Hart's Executors, 4 Wheat. 1, 33, 39, 43, 44, 45; Stubbs v. Sargon, 2 Keen, 255; Fowler v. Garlike, 1 Russ. & Mylne, 232.

It will be insisted, as was said before, that under these authorities the devise in Charles Bennett's will is not a charitable devise, under the doctrine of charities; as it exists in England, and some of the States of the Union.

But suppose that these views are erroneous, or concede, for the sake of the argument, that this vague and uncertain devise is such an one as would be aided and enforced in England as a charitable devise, and under the doctrine of charities, whether of common law or statutory birth, the appellees

must go a step further, and show that the doctrine of charities was the law of the County of Alexandria when the will took effect. This is utterly and confidently denied.

When the County of Alexandria was separated from Virginia, An act of Congress was passed (February 27, 1801), entitled, "An act concerning the District of Columbia," by the first section of which it was enacted, "that the laws of the State of Virginia, as they now exist, shall be and continue in force in that part of the District of Columbia which was ceded by the said State to the United States."

The question, then, is, What was the law of Virginia on this subject, on the 27th of February, 1801? The answer is: —

1. That the statute of 43d Elizabeth was repealed on the 27th December, 1792. 1 Revised Code, 136.

2. That the Court of Appeals of Virginia, has decided, that, according to the true intent and meaning, force and effect, of the repealing statute, it repealed not only the statute of 43d Elizabeth, but the whole doctrine of charities, the common law having been merged in the statute. In Gallego's Executors *v.* The Attorney-General, 3 Leigh, 450, it was well said by the president of the court, speaking for the whole court, "that a due sense of the infinite difficulty and embarrassment which must attend the search after the common law doctrines anterior to the statute of Elizabeth, and a just view of the danger of reviving those obsolete doctrines, must determine us to leave the subject to the wisdom of the legislature itself."

By this decision, whether founded on good or bad reasons, it is established that, since the 27th December, 1792, it is the law of Virginia, and consequently the law of the County of Alexandria, that the courts of chancery cannot aid vague and defective grants or devises, even though they be for charitable purposes.

Vidal *v.* Girard's Executors, 2 How. 127, does not touch the question before this court, which is, What was the law of Virginia on the 27th of February, 1801? That was a question as to what was the law of Pennsylvania. And it was decided that, in Pennsylvania, a corporation capable of taking and having corporate powers over the subject of education could lawfully take and apply a bequest for the erection of a great free school, the pupils to be white males, between six and ten years old, &c., &c. In page 192, Judge Story says, — "There are two circumstances which materially distinguish that case [Baptist Assoc. *v.* Hart's Ex'rs] from the one now before the court. The first is, that it arose under the law of Virginia, in which

the statute of 43d Elizabeth has been expressly and entirely abolished by the legislature," &c. And in the same page (192) he says, that it has been decided by the Supreme Court of Pennsylvania, " that the conservative principles of the statute of Elizabeth have ever been in force in Pennsylvania, by common usage and constitutional recognition." And again he says (p. 197), — " The case, then, according to our judgment, is completely closed in by the principles and authorities already mentioned, and is that of a valid charity in Pennsylvania."

*Mr. Mason* then referred to the following acts and cases : —

An act for establishing religious freedom. Laws of Va., 1 Rev. Code, 1819, p. 77.

An act concerning glebe lands and churches in this commonwealth. Ibid., p. 79.

An act concerning conveyances or devises for schools, &c. Sess. Acts of 1839, p. 11.

*Literary Fund v.* Dawson, 10 Leigh, 147.

An act concerning the estate of Martin Dawson, deceased, and for other purposes. Sess. Acts of 1840 – 41, p. 52.

An act concerning conveyances or devises of places of public worship. Sess. Acts of 1841 – 42, p. 60.

Janney's Executor *v.* Latane, 4 Leigh, 327.

2d. *The release.*

What, then, is to prevent a decree in this case like that made by the Lord Chancellor in Morice *v.* Bishop of Durham, 10 Ves. 543 ? " It was the intention to create a trust, and the object being too indefinite, it has failed. The consequence of law is, that the bishop takes the property upon trust, to dispose of it as the law will dispose of it."

Why not make such a decree in favor of Wheeler ? The answer given by the appellees is, that on the 4th of May, 1839, in consideration of $ 25,000, he executed a release of all his interest in the trust fund, and that the release was legal, equitable, and binding.

And so the question is, Was the *res gesta* of May 2d, 3d, and 4th, terminating in the execution of an instrument of writing called a release, a *bonâ fide*, legal, and valid transaction, on the one hand, or was it, on the other, an illegal, inequitable, and void transaction ? It will be contended that it was an illegal, inequitable, and void transaction, because of the partiality and misconduct of the trustees, as set forth in the bill.

But the release, executed under the circumstances detailed in the bill, is supposed to be invalid on other grounds.

1. Wheeler was misinformed in matter of law, however innocently, by Mr. Taylor, an old and trusted friend of his uncle,

executor of his will, and one for whom he, Wheeler, enter-tained "an habitual and profound respect." He confided in Mr. Taylor's statement of the law, and was misled.

2. Wheeler was left in ignorance of the amount of the resi-due, which he was called on to release. He signed the release in ignorance. Here, then, was surprise in matters of fact.

This view is sustained by Pusey v. Desbouvrie, 3 P. Wms. 315, and Story's comments on it. 1 Story's Equity, §§ 117, 118. See also Evans v. Llewellin, 1 Cox, 333.; 1 Story's Equity, § 191. See 1 Story's Equity, § 119; see also 1 Story's Eq. 133, note to § 120.

It is submitted that, on the principles settled by these author-ities, the release was void.

But there is still another view of this part of the case, which ought to be conclusive against the validity of the release. The question of the validity of the release cannot arise, or be con-sidered by the court, unless and until the court shall have first decided that the devise was void and of no effect, and the pre-tensions of the Common Council of Alexandria to take under it altogether baseless. The question, then, of the validity of the release, when it comes under the consideration of the court, is virtually a question whether the executors of Charles Bennett, or his heir at law and next of kin, shall take his estate. The only other claimant, the Common Council of Alexandria, has been already adjudged to have no rightful claim; and the only parties left on the field to contend for the estate are the execu-tors, who hold it in possession, but have not a color of right to it, and the heir at law, who, according to the opinion already formed by the court, is the rightful owner, but for the release.

To sustain the release, then, is to decide that executors have a right to deal with a needy heir or devisee, to practise on his necessities, and to tempt him, by the present payment of a part of what is due to him, to transfer to them all the rest, for their own private and personal use and benefit. No evil intentions are imputed to the executors in this case; but in asking the court to sustain the release, they virtually ask it to give them, clear of all trust and burden, the bulk of their testator's estate. Nothing can be more clear than that an instrument of writing, or contract, whose recognition and validity would lead to such results, is void in equity.

To show that the decision of the Court of Appeals of Virgin-ia in the case of Gallego's Executors v. The Attorney-General ought to be regarded by the Supreme Court of the United States as the law of this case, the following authorities are relied on. Elmendorf v. Taylor, 10 Wheat. 159 and 165;

Jackson v. Chew, 12 Wheat. 153 et seq.; Blight v. Rochester, 7 Wheat. 550; McKeen v. Delancy's Lessee, 5 Cranch, 22; Bodley v. Taylor, 5 Cranch, 221; Deneale v. Stump's Executors, 8 Pet. 528 – 531.

Brand's Administrator v. Brand et al., in Court of Appeals of Virginia. Petition for an appeal from a decree, &c. Appeal prayed on the ground, "that the case of Hart v. The Baptist Association was erroneously decided, and erroneously followed in Gallego's Executors v. The Attorney-General; that it is now well ascertained that the powers of the chancery court over devises to charities existed prior to the 43d Elizabeth, and that the chancery courts in Virginia may exercise those powers." April 20, 1847, appeal denied.

It is further contended, should the release be operative so as to pass to the defendants all the right and title of the appellant, as next of kin and heir at law of the testator to his residuary estate, that the effect will only be to leave the estate in the residuum subject to the same trusts which are created by the will and subject to the same objections at law. We further contend that the executors, being trustees, could not purchase from the heir or next of kin as done by the alleged release.

2 Rob. 302, 303, note. Law of Virginia entitled "An Act concerning the estate of Martin Dawson, deceased, and for other purposes." Session Acts, 1840 – 41, p. 52. Literary Fund v. Dawson, 10 Leigh, 147. Law of Virginia entitled "An Act concerning conveyances or devises of places of public worship." Session Acts, 1841 – 42, p. 60. Act concerning religious freedom, 1787. Glebe lands, &c., 1802. Act concerning devises for schools, &c. Session Acts of 1839. Janney's Executors v. Latane, 4 Leigh, 327

On the part of the appellees it was contended, —

I. That the residuary devise is a valid testamentary disposition of the said residuum.

1. That it creates a valid trust, having, — 1st. The residuum as its subject-matter; 2d. The executors, as trustees, certainly defined and competent to take; and 3d. A beneficiary certainly defined and competent to take, the Corporation of Alexandria.

The first two points or elements of a valid trust need no remark or support.

3d. That the "town of Alexandria" describes with sufficient accuracy the legal body, the Common Council of Alexandria.

2 U. S. Stat. at Large, Feb. 25, 1804, §§ 1, 2, 3, 5, May 13, 1826, § 3, May 20, § 1; Pr. Man. Co. of the Berks and Dauphin T. P. Co. v. Myers, 6 Serg. & Rawle, 12, 17; Road

Co. *v.* Creeger, 5 Har. & Johns. 122, 124; 1 Monroe, 175; 10 Co. 122, *b*; Attorney-Gen. *v.* Mayor of Rye, 7 Taunt. 546, 550; Owen, 35; First Parish *v.* Cole, 3 Pick. 232, 237, 240; 2 Lomax's Dig. 208, § 4; Culpeper Man. and Agr. Soc. *v.* Diggs, 6 Rand. 165; 3 Lomax's Dig. 150, § 5; Angell on Corp. 77, 78, 150; 1 Jarman on Wills, 330, 331; 2 Stat. at Large, 255–257; 4 Stat. at Large, 162, 164, 177; Hobart, 33; 10 Mass. 360; 10 N. H. 123; 1 Hoffm. 205; Duke, 380, 381.

4th. That the corporation of the town of Alexandria is competent to take the property under the will.

2 and 4 U. S. Stat. at Large, Feb. 25, 1804, § 3, May 13, 1826, §§ 2, 3; 3 Lomax's Dig. 12, § 14; 2 Thomas's Coke, 184, 185, note 2; 1 Lomax's Dig. 577, § 8; 1 Drury & Warren, 258, 294.

2. If not valid as an ordinary trust between private persons for private purposes, it is valid as a gift to a charitable use.

The degrees of certainty requisite in the beneficiary vary with the object. For private purposes, generally, natural persons or corporations alone can take. For public and charitable purposes the law recognizes the general public, or definite portions of it, not incorporated, as competent to take; and the town of Alexandria is such a beneficiary, under the law of charitable uses.

Mayor of New Orleans *v.* U. States, 10 Peters, 662; City of Cincinnati *v.* Lessees of White, 6 Peters, 431; Barclay et al. *v.* Howell's Lessee, 6 Peters, 498; Beatty and Ritchie *v.* Kurtz, 2 Peters, 566; The Incorp. Soc. of Dublin *v.* Richards, 1 Drury & Warren, 294; Attorney-Gen. *v.* Mayor of Dublin, 1 Bligh, 312, 346, 349; Vidal *v.* Girard's Executors, 2 How. 127; Widman *v.* Lex, 17 S. & R. 88; 2 Institute, 200; 1 Thomas's Coke, 30; 1 Bl. Com. 89; Duke, 131, 154, 155, 163; 1 Hoffm. 239, 266; 7 Verm. 276, 319; 4 Dana, 356, 358; 2 Russ. 417, 419, 420; 6 Paige, 649; 7 Paige, 77, 78, 79.

That the gift for such purposes as should be "most beneficial to the town and trade of Alexandria," creates and describes a public charitable use. 2 Peters, 566; 2 Story, Eq. Jur. §§ 1190, 1191; 2 How. 189; Mayor of London's case, Duke, by Bridgman, 380, 381; 2 Story, Eq. Jur. § 1170; 1 Ch. Cas. 267; Attorney-Gen. *v.* Platt, Rep. Temp. Finch, 221; Duke, by Bridgman, 356, 374, 375; Wingfield's case, and also Pennyman *v.* Jenny, Ibid.; Stat. 43 Eliz., Ap. 1 Drury & Warren, or Eng. Stat. at Large; Baptist Ass. *v.* Hart's Executors, 4 Wheat. 1; 17 S. & R. 88; Town of Pawlett *v.* Clark et al., 9 Cranch, 272, 338; Shotwell's Executor *v.* R. Mott; McCartee *v.* Orph. Ass., 9 Cow. 437; Duke, 380, 381; 1 Turn. & Russ. 270,

271; 4 Ves. 542, 544, 551; 2 Sim. & Stu. 67, 76, 77; 1 Philips, 185, 190; 2 Roper and White, Leg. 1119, ch. 19, § 1; 1 Keen, 232; 1 Hoffm. 239, 266; 4 Dana, 356, 358.

II. If the residuary devise and bequest be void, the release bars the complainant's claim, unless it be avoided.

It is not averred to have been obtained by fraud, nor by duress, nor by surprise, but only, "that on the statement of facts herein before made, the release aforesaid was void in equity, and in no way binding on him as a release."

But first, —

1. The instrument is not a release merely, i. e. of an acknowledged right, for a consideration, but a compromise of a contested and doubtful claim.    Leonard v. Leonard, 2 Ball & Beat. 171, 180; 1 Sim. & Stu. 555, 564, 566; 5 Pet. 99, 114.

2. The "circumstances aforesaid" do not show a case either of fraud or duress, or of hasty and inconsiderate action, under undue influence, operating a surprise, such as a court of equity will relieve against.    1 Story, Eq. Jur. § 251; Earl of Bath and Montague's case, 3 Ch. Cas. 56, 74, &c., and Somers's remarks, 114; Evans v. Llewellin, 1 Cox, 333, 341; Leonard v. Leonard, 2 Ball & Beat. 171, 179, 180, 181; Cory v. Cory, 1 Ves. 19; 1 Story, Eq. Jur. §§ 116, 131, and note 4; Stewart v. Stewart, 1 Clark & Fin. 911, 954; Brown v. Prig, 1 Ves. sen. 407, 408; Bent v. Barlow, 3 Bro. C. C. 451; Blackford and Wife v. Christian, 1 Knapp, 77, 78; 1 Sim. & Stu. 555, 564, 566; 3 Swanst. 476; 1 Bro. C. C. 22.

III. The complainant has failed to aver his readiness to pay to the defendant the price of the release, and has also failed to bring that money into court; without which a court of equity will not entertain a bill to vacate the instrument.

*Mr. Cooke*, for the appellant, in reply and conclusion, contended, that the "town of Alexandria" did not mean the "Common Council of Alexandria."

It is worthy of remark, that in this important devise, which disposes of the great bulk of the testator's property, real and personal, not a word is said about "the Common Council of Alexandria," the body politic created by an act of Congress to administer the affairs of the town.    And yet it can scarcely be doubted, that the name, powers, and functions of that body were as familiar to the testator as household words.    It is difficult to account for this significant silence, but by supposing that the testator had determined that the corporate authorities of the town should have no agency whatever in carrying out the beneficent purposes vaguely suggested by his will.

In what character, indeed, could the corporation act, without deranging the scheme set forth in the devising clause above quoted?   Not in the character of trustees; for the testator had selected as trustees, to carry out his purposes, three highly esteemed personal friends, including an eminent lawyer; three men of whom he had emphatically said, that they had "all the confidence which he could repose in man"!

If that part in the drama was filled, what other part could the corporation perform?   The part of beneficiaries, — of persons to receive and enjoy the bounty of the testator?   That were absurd.

The testator's motive or reason for excluding the corporation from all participation in the trust was probably his want of confidence in the wisdom of a fluctuating popular body; or, in other words, his conviction of their incapacity to manage so difficult a trust.

That it was a difficult trust, a single glance at the testator's crude and undigested plan will clearly show.   When the testator described the selected objects of his bounty as "the town and trade of Alexandria," he meant neither the ground included within the territorial limits of the town, nor the Common Council of the town.   He meant the people of the town, and especially the traders, having been a trader himself during the greater part of an active life.   He wished a scheme or detailed plan to be devised and executed, by which a fund of about $120,000 should be so used as to confer on the objects of his bounty the greatest degree of benefit which such a fund could confer on beneficiaries so numerous.   Nothing could be more difficult than the conception and execution of the details of such a half-formed scheme.   Talents, legal learning, and zeal, he thought he had found in his three trusted friends; in the Common Council he had no right to expect any one of these essential qualities.   He felt, himself, that he was wholly unequal to the task, and he did not think that the Common Council was likely to be more capable than himself.

The result of this inquiry into the true intent and meaning of the 20th clause of the will is, that the idea of making the "Common Council of Alexandria" beneficiaries under the will is a solecism, since beneficiaries are those who take and enjoy, while a corporation can take only in trust for those who are to enjoy; that the beneficiaries contemplated by the testator were the people, and especially the traders of Alexandria; and that the only inference which can be reasonably made from the omission of the testator to mention the Common Council is, that he intended that they should have nothing whatever to

do with the trust, in any character; an inference which is sustained by the fact that he selected others, to wit, his attached and personal friends, to perform the only functions which the Common Council were capable of performing, namely, the functions of trustees. How deficient in legal certainty the whole scheme of the trust was will in due time be shown.

*Mr. Cooke* then contended that this devise in the will was revoked in the codicil, and superseded by one of a still more vague and indefinite character, investing the trustees with a still more ample and even unlimited discretion.

After examining this point, *Mr. Cooke* proceeded to show that the devise in the will (and *a multo fortiori* the devise in the codicil) creates, or attempts to create, a trust which is void for uncertainty, and one which a court of chancery will not and cannot enforce, on the general or ordinary principles of trusts.

In support of this proposition, he cited Story on Equity, *Trusts,* § 979 *a,* and commented on the authorities there referred to, and 3 Leigh, 450 – 491.

The devise to which these doctrines are to be applied is a devise " in trust for such purposes as my executors consider promises to be most beneficial to the town and trade of Alexandria."

The principal classes in every seaport town are professional men, manufacturers, including handicraftsmen, navigators, and traders, or men whose business it is to buy and sell for profit. The testator was himself a trader, and the fair inference from the fact that he mentions that class only is, that he intended that they should be specially benefited. But how and to what extent they were to be preferred, the testator has omitted to say. In this respect, then, the devise is vague and uncertain. But, waiving this discrimination between the traders and the people in general, it has been shown that the people, and not the "Common Council" of Alexandria are the real beneficiaries. It has been shown that the testator intended to exclude the Common Council from all agency in the trust, and from all benefit. The Common Council could act only as trustees, and that office is filled by the executors.

It is a fatal objection to this trust, therefore, that there is no beneficiary capable of filing a bill against the trustees to enforce the trust. The people and traders of Alexandria were a continually fluctuating body of men, incapable, on the plainest and most elementary principles, of instituting and carrying on a suit in law or in equity.

But suppose that this uncertain and ever-changing body, " the people and traders of Alexandria," or suppose, if you will,

that "the Common Council," or any conceivable representative of the beneficiaries, were permitted to exhibit a bill against the trustees for relief. How could they, under this devise, define the relief to be given to them? Or, if they asked for general relief only, how could the court, under this devise, undertake to define the relief to which the beneficiaries were entitled? The mode of applying the fund to their benefit is left to the absolute ·and unlimited discretion of the trustees or executors. Could the court decree that the fund should be invested in stocks, and the proceeds applied to the diminution of the poor-rates? Could the court decree that a portion of the principal or accruing interest should be lent to young traders just entering into business, and another portion to embarrassed traders, who could give good security to repay the loan? Could the court decree that the whole fund should be applied to the extinguishment of so much of the debt of the corporation? Or is there any other conceivable appropriation of the fund or its interest which would not be liable to the overruling objection of the trustees, "that they do not consider such appropriation as promising to be most beneficial to the town and trade of Alexandria"?

Suppose that, to get clear of this difficulty, the court were to order the trustees to report to the court such a scheme as promises in their opinion to be most beneficial to the town and trade of Alexandria, and that the trustees were to disregard the order? What would be the remedy? Could the court do more, as against them, than annul the powers of the trustees, and take the fund out of their hands? Suppose that this were done. The question would still recur, What is to be done with the fund?

And how would the court relieve itself from this difficulty? Why, simply by referring to one of its canons, laid down by Judge Story in his Equity Jurisprudence, § 979, *a*, — "Courts of equity carry trusts into effect only when they are of a certain and definite character." And to another canon laid down by the same jurist, in § 979, *b*, that when such uncertain and indefinite trust is created by a will, the property passes to the next of kin or heir at law.

So in the case of Morice *v.* Bishop of Durham, 10 Ves. 542, the Lord Chancellor said, — "It was the intention of the testatrix to create a trust; and the object, being too indefinite, has failed. The consequence of law is, that the trustee takes the property upon trust, to dispose of it as the law will dispose of it. I think, therefore, the decree is right." The Master of the Rolls had decreed a distribution of the trust fund among the next of kin.

*Mr. Cooke* then contended that the devise could not be sustained by being brought within the doctrine of "charities," because the courts in England would only protect those charities specially enumerated in the statute of 43d Elizabeth, within which classes this devise could not be included. 2 Story's Eq. § 1160; 2 Fonbl. Eq., Book 2, part 2, ch. 1, note *b*; 2 Story's Eq. §§ 1155 – 1158, 1183, and authorities there cited.

*Mr. Cooke* then examined how far the release was binding upon Wheeler, and commented on the following circumstances : —

1. The straitened circumstances of William Wheeler.

2. The knowledge in the executors of his straitened circumstances.

3. The snortness of the notice to the heir at law of the intended probate.

4. The preliminary conference with Mr. Smith, in which that gentleman "spoke much and earnestly of the inevitable delay and vexation of a suit." "The will would be thrown in chancery, where it would remain for years." "A course might be taken by which expense and delay might be avoided."

5. Mr. Taylor, at the conference, said that there was but one opinion in the bar, and that was in favor of the validity of the devise.

6. Mr. Taylor said his own opinion was, that the devise in question was a legal and valid disposition of the residue of the estate. "When your orator, now greatly disheartened, intimated, deferentially, that he had taken up a contrary opinion, Mr. Taylor said that he admitted that in Pennsylvania such a devise would not be good, but that it was good under the old law of Virginia, as it existed at the time of the cession of the town of Alexandria by Virginia, which law was the law of the County of Alexandria up to the time of Bennett's death."

7. An undoubting confidence was expressed in the ultimate result of the suit. But, "to avoid the delay of a lawsuit, they were willing to pay for a release of your orator's claim, however untenable and desperate." (Substance stated, and not the words used.)

8. That Mr. Taylor was a man of "commanding intellect," and the plaintiff "entertained for him an habitual and profound respect."

9. That plaintiff, "having no distinct or settled views of the legal question thus suddenly forced upon him, or time to form any, — fevered by a rapid journey, — his spirits depressed by the recent death of his last kinsman, to whom he had been ten-

derly attached, — and flurried and confused by the magnitude of the question he was called on to decide, and the necessity of deciding it at once, — felt himself wholly overpowered, and strongly inclined to succumb to the views so forcibly presented to him. And these views were, moreover, recommended to his favorable consideration by the offer, so tempting to a man in his situation, of a large sum of money without delay or further trouble."

10. "Your orator was given to understand that the will would and must be offered for probate on the next day."

11. It was impossible, in the time allowed him, to obtain counsel. "He was, therefore, compelled to decide, without the aid of counsel, whether he would make the legal validity or invalidity of the devise the basis of his action; and being entirely in the dark, he concluded that the only safe course was to consider the devise void, and take what he could get for a release."

12. It was under this duress of circumstances that he agreed to release his whole interest of $25,000.

Mr. Justice McLEAN delivered the opinion of the court.

This controversy arises under the last will and testament of Charles Bennett, late of Alexandria. After making a number of specific bequests, the testator declares, — "The residue of my estate is left in trust of Hugh Smith, Robert I. Taylor, and Phineas Janney, for such purposes as they consider promises to to be most beneficial to the town and trade of Alexandria. If any difficulty occurs in construction as to any of my bequests, R. I. Taylor is especially charged to give said construction." Smith, Taylor, and Janney were appointed executors.

In a codicil the testator declares, — "Now in the inclosure I leave the residue of my estate, after paying all bequests and appropriations, to some disposition thereof which my executors may consider as promising most to benefit the town and trade of Alexandria. Now I leave the same entirely to their disposition of it, in such manner as appears to them promises to yield the greatest good."

The complainant, William Wheeler, is next of kin and heir at law to the testator. He filed his bill to set aside the above devise, and also the compromise he made with the executors, under the impression that the devise was valid.

On reading the above residuary disposition of his estate, we cannot but observe the fact, that the testator had no settled purpose as to the mode of applying his bequest to "benefit the town and trade of Alexandria." The town and trade of any

commercial city are closely connected, and whatever shall benefit the one will advance the interest of the other. These interests are inseparably blended; but they were treated by the testator as distinct objects of his solicitude and bounty. Perhaps no matter could give rise to a greater diversity of opinion, than that which is involved in this devise. Shall the objects of the testator be most advanced by extending the lines of internal communication connected with the town, such as turnpike roads, railroads, or canals; or by improving and extending the wharves and warehouses of the city; or by deepening the harbour and removing obstructions to navigation; or by loaning the capital to men engaged in commerce; or by aiding some other enterprise beneficial to the trade and town? Shall the bounty be limited to our own citizens, if foreigners shall do more than they, to carry out the expressed objects of the testator?

Under this devise, how can a court of chancery correct an abuse of the trust? By what means shall it ascertain the misapplication of the fund? There is nothing to restrain the discretion of the trustees, or to guide the judgment of the court. If the trust can be administered, it must be administered at the will of the trustees, substantially free from all legal obligation.

But before we pronounce on the character of this trust, it is important to know by what law it is governed. Is the common law of England in relation to charities, as modified and enlarged by the statute of the 43d of Elizabeth, in force in Virginia? Charities have been administered, both at common law and in chancery, from an early period of English jurisprudence. But the earlier decisions in that country are often inconsistent, and of no great weight of authority. The prerogative of the king was invoked as *parens patriæ* where the charity was indefinite, and a most liberal construction was given to the act of the 43d of Elizabeth; and under these influences a system has grown up in England favorable to the policy of charitable bequests. So far has this policy been carried, that where the devise has been uncertain or impracticable, it has been sustained in some instances by what was supposed to be the intent of the testator, or by approaching as near to it as practicable.

It would seem from the preamble to the statute of Elizabeth, that its object was mainly to institute a remedy where the charitable intent of the founders had not been carried out, by reason of frauds, breaches of trust, and negligence in those that should pay, &c. All the objects specified in that statute are denominated charities, though they embrace " the repairing of

bridges, ports, havens, causeways, churches, sea-banks, high-ways," &c. There are some cases of charity, from their na-ture, though not specified in the statute.

Whether this policy has been wisely cherished by the Eng-lish government is not a matter for our consideration. Char-itable bequests, from their nature, receive almost universal com-mendation. But when we look into the history of charities in England, and see the gross abuses which have grown out of their administration, notwithstanding the enlarged powers of the courts, aided by the prerogative of the sovereign and the legislation of Parliament, doubts may be entertained whether they have, upon the whole, advanced the public good.

When this country achieved its independence, the preroga-tives of the crown devolved upon the people of the States. And this power still remains with them, except so far as they have delegated a portion of it to the Federal government. The sovereign will is made known to us by legislative enactment. And to this we must look in our judicial action, instead of the prerogatives of the crown. The State, as a sovereign, is the *parens patriæ.*

The common law, it is said, we brought with us from the mother country, and which we claim as a most valuable herit-age. This is admitted, but not to the extent sometimes urged. The common law, in all its diversities, has not been adopted by any one of the States. In some of them it has been modified by statutes, in others by usage. And from this it ap-pears that what may be the common law of one State is not necessarily the common law of any other. We must ascertain the common law of each State by its general policy, the usages sanctioned by its courts, and its statutes. And there is no sub-ject of judicial action which requires the exercise of this dis-crimination more than the administration of charities. No branch of jurisprudence is more dependent than this upon the forms and principles of the common law.

In this view, we must look to the laws of Virginia as govern-ing this bequest. Alexandria was ceded to the Union by Vir-ginia in 1801, but the laws of that State, as they then existed, remained in force over the ceded territory. It has since been retroceded to Virginia. By an act of the Virginia Legislature in 1789, followed by one in 1790, a commission was appointed on English statutes, and in the act of 1792 all English statutes then in force were declared to be repealed; "the Legislature re-citing that, at that session, it had specially enacted such of them as appeared worthy of adoption." The statute of the 43d of Elizabeth, if it ever was in force in Virginia, was repealed by the above act.

Some of the principles applicable to this case were considered by this court, in the Baptist Association *v.* Hart's Ex'rs, 4 Wheat. 1.   Hart, a citizen of Virginia, made his will, which contained the following bequest : — "Item, what shall remain of my military certificates at the time of my decease, both principal and interest, I give and bequeathe to the Baptist Association that for ordinary meet at Philadelphia annually, which I allow to be a perpetual fund for the education of youths of the Baptist denomination, who shall appear promising for the ministry, always giving a preference to the descendants of my father's family."   In that case, the court held that "charitable bequests, where no legal interest is vested, and which are too vague to be claimed by those for whom the beneficial interest was intended, cannot be established by a court of equity, either exercising its ordinary jurisdiction, or enforcing the prerogative of the king as *parens patriæ*, independent of the statute 43d Elizabeth."   And it was said the statute of 43d Elizabeth had been repealed in Virginia.

In the case of Gallego's Ex'rs *v.* The Attorney-General, 3 Leigh, 450, the court held that " the English statute of charitable uses, 43 Elizabeth, having been repealed in Virginia, the courts of chancery have no jurisdiction to decree charities where the objects are indefinite and uncertain."

" If a trust be created in a party, but the terms by which it is created are so vague and indefinite that courts of equity cannot clearly ascertain either its objects or the persons who are to take, then the trust will be held entirely to fail, and the property will fall into the general funds of the author of the trust." Story's Eq. Jur., § 979, *a.*   " So, where a testatrix bequeathed the residue of her estate to her executors, ' upon trust to dispose of the same at such times, and in such manner, and for such uses and purposes, as they shall think fit, it being my will that the distribution thereof shall be left *to their* discretion,' " it was held to be void for uncertainty.   Ibid., § 979, *b.*

In Wright *v.* Atkyns, 1 Turn. & Russ. 157, Lord Eldon said, that in order to determine whether a trust of this sort is a trust which a court of equity will interfere with, it is matter of observation, first, that the words should be imperative ; secondly, that the subject must be certain ; and thirdly, that the object must be as certain as the subject.   This principle is also strongly illustrated in the case of Wood *v.* Cox, 2 Mylne & Craig, 684 ; 10 Leigh, 147.

In Morice *v.* The Bishop of Durham, 10 Ves. 521, where a bequest " in trust for such objects of benevolence and liberality as the trustee in his own discretion shall most approve, cannot

be supported as a charitable legacy; and is therefore a trust for the next of kin." This was under the statute of 43d Elizabeth. The court said, "The trust must be of such a nature that the administration of it can be reviewed by the court; or if the trustee die, the court itself can execute the trust." And the court remark, in regard to the case before them, "The trustee takes not for his own benefit, but for purposes not sufficiently defined to be controlled and managed by this court."

The case of Vidal *v.* Girard's Ex'rs, 2 How. 127, was decided under the law of Pennsylvania. The court say, "It has been decided by the Supreme Court of Pennsylvania, that the conservative principles of the statute of Elizabeth have been in force in Pennsylvania by common usage and constitutional recognition."

In a late case in Virginia, not yet reported, of Brand's Adm'r *v.* Brand et al., the following devise was held to be void:—
"Third, I give to the Rev. W. J. Plummer, D. D., the residue of my estate, both real and personal, in trust for the board of publication of the Presbyterian Church in the United States."

From the principles laid down in the above cases, it is clear that the devise under consideration cannot be sustained. A trust is vested in the executors, but the beneficiaries of the trust are uncertain, and the mode of applying the bounty is indefinite. It is argued that the testator intended to give to the town of Alexandria, in its corporate capacity, the residuum of his estate. But he did not so express himself. On the contrary, it clearly appears that the executors were made the repositories of his confidence, and the only persons who were authorized to administer the trust. The *cestui que trusts* were the town and the trade of the town. It would be difficult to express in more indefinite language the beneficiaries of a trust. How can a court of chancery administer this trust. On what ground can it remove the trustees for an abuse of it. The discretion of the trustees may be exercised without limitation, excepting that the fund must be applied for the benefit of the trade and town of Alexandria. And if the application of the fund be, however remotely, connected with the objects of the trust, the judgment of the court could not be substituted for the discretion of the trustees. It is doubtful whether so vague a bequest could be sustained under the 43d of Elizabeth. Without the application of the doctrine of *cy-pres*, it could not be carried into effect. In Virginia charitable bequests stand upon the same footing as other trusts, and consequently require the same certainty as to the objects of the trust and the mode of its administration.

But the defendants insist, that the right of the complainant was compromised and finally settled, which is shown by a writing under seal, and under which they paid to him twenty-five thousand dollars.   The complainant prays that this agreement may be set aside as inoperative and void.

It appears from the bill, that the complainant resides in the State of Pennsylvania, and that so soon as he could raise the means of paying his expenses, after he heard of the death of his uncle, he came to Alexandria.   He had an interview with the executors, and stated to them his determination to test the validity of the will, so soon as he should be able to employ counsel.   This was before the probate of the will.   Mr. Smith, one of the executors, expressing great kindness for him, was anxious to avoid a lawsuit.   He did not fear the result, as the executors had been advised by counsel in whom they had confidence, that the will was valid.   He represented the vexations, delays, and expenses of a lawsuit, and intimated to the complainant that the executors were willing to pay a sum of money to him if the matter could be compromised.

It appears that the complainant had been prodigal in his expenditures, and that, notwithstanding the provisions for his support which had been made for him by his uncle, he was without means and embarrassed.   When the interview took place which led to the compromise, the complainant again expressed his conviction that the will was not valid, and declared that he should try its validity by legal proceedings.   Mr. Taylor, one of the executors, was a distinguished lawyer, a man of high standing, and in whom the complainant reposed the greatest confidence; he represented to the complainant that he had sundry written opinions of counsel in favor of the legal validity of the residuary devise, which he offered to show to him.   His conversation conveyed to the complainant " the clear and distinct impression, that there was but one opinion among the lawyers consulted, and that they were unanimous in favor of the validity of the devise."   The complainant asked Mr. Taylor to state his opinion on the subject.   He observed, that the complainant should not have asked him, but his opinion was, " that the devise in question was a legal and valid disposition of the residue of the estate."   At the same time, he admitted that in Pennsylvania such a devise would not be good; but that it was good under the old law of Virginia.

The complainant alleges that he had no settled views of the legal question, and being disheartened by the circumstances under which he was placed, he yielded to the compromise. He had but little time for reflection, and none to advise with

counsel; and at last he came to the conclusion to consider the devise valid, and take what he could get for a release.

Under these circumstances, the complainant agreed to the compromise. It stated the residuary devise, and that its validity had been controverted by the complainant. That "the said executors, taking on themselves the burden of the execution of said will, and of the trusts aforesaid, and the said William Wheeler, to avoid the delay and expense of litigation, and finally to settle and adjust all doubts and difficulties which might arise on the effect of said will, so as to leave the said executors to execute the same without delay or impediment, have agreed on the following terms of compromise."

1st. That twenty-five thousand dollars shall be paid to the complainant. 2d. That the executors shall release to him all claims to any property, real or personal, conveyed or settled on complainant by the testator in his lifetime. 3d. That the complainant shall release to the executors "all his claims, in law or equity, to the estate, real and personal, devised and bequeathed, or intended to be devised or bequeathed, by the said Charles Bennett by his said will, to be held and disposed of by the said executors in the manner in and by the said will prescribed. And that the said executors shall be at liberty, if any specification of the objects to which the residuary fund is to be applied be thought necessary, to apply the same to aid in finishing the Alexandria Canal, &c., and to subscribe to any railroad or other roads communicating with the said town; to any or to all of the above purposes, in such way as the said executors, or the survivors, may think most conducive to the prosperity and welfare of the town," &c.

The complainant, it seems, had studied law, but it is manifest from the facts before us, that he was but little acquainted with business, was an inefficient and dependent man, easily misled, especially by those for whose abilities and characters he entertained a profound respect. From the high character of the executors, no one can impute to them any fraudulent intent in this transaction. Looking to what they considered to be the object of the testator, they felt themselves authorized, if not bound, to effectuate his purposes by making this compromise with his heir at law. They had no personal interest beyond that which was common to the citizens of Alexandria. And we admit that they may have acted under a sense of duty, from a misconception of their power under the will.

But in making the compromise, the parties did not stand on equal ground. The necessities and character of the complainant were well known to the executors. Having the confi-

dence expressed in the validity of the devise, they could hardly have felt themselves authorized to pay to the complainant twenty-five thousand dollars for the relinquishment of a pretended right. Nor could they have deemed it necessary, in the agreement of compromise, substantially to constitute him the donor of the munificent bequest to the town and trade of Alexandria.

We are to judge of this compromise by what is stated in the bill, the facts being admitted by the demurrer. And it appears to us that the agreement, under the circumstances, is void. It cannot be sustained on principles which lie at the foundation of a valid contract. The influences operating upon the mind of the complainant induced him to sacrifice his interests. He did not act freely, and with a proper understanding of his rights.

The decree of the Circuit Court is reversed, the demurrer overruled, and the cause remanded for further proceedings.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Columbia, holden in and for the County of Alexandria, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded, for further proceedings to be had therein in conformity to the opinion of this court.