Casey, C. J.,
concurring.
I agree in the findings and judgments in the cases of Higdon, Morgan, Geffroy, and Reeside. I dissent from nearly all the positions assumed in the opinion just read, and proceed to state the views I entertain in the cases. Nor is there an agreement of a majority of the court as to any of the doctrines hnnounced. The views contained in these opinions are not to be ..regarded as the decision of the court, but of the particular judges wlio delivered them, or expressly assented to them.
In July, 1861, Major General John C. Frómont was assigned by the President to the command of the department of the west, with headquarters at St. Louis. This happened at a period when the military operations undertaken against the rebellion had been unsuccessful in the west and disastrous in the east. A call had been made by the President for a large number _ of volunteers. Fremont was charged with the duty of organizing, equipping, and furnishing a large army out of the western and northwestern quotas. Whatever powers the President and Secretary of War could confer upon him he possessed, even to the selection of his own officers, whom the President assured him beforehand he would commission. Upon this subject General Fremont testifies as follows:
“No special object was given me in charge to do, nor was I furnished with any particular plan of a campaign. The general discussions at Washington resulted in the understanding that the great object in view was the descent of the Mississippi; and for its accomplishment *38 I was to raise and organize an army, and when I was ready to descend the river, I was to let the President know.
“Full discretionary powers of the amplest hind, were conferred on me. Not a line of written instructions was given me.
“ This leading object of the campaign being settled, the details of its accomplishment and the management of my department were left to my own judgment.
“ No specific powers were given to me. But no restriction whatever was placed upon me in taking command of the department.
“ I understood and expected to exercise any and whatever power was necessary to carry out the work I was sent to accomplish, whether strictly within the limits of the power conferred by my commission or not.
“I derived my povier in that respect from the President, and from conversations with the Secretary of War, and Mr. Blair, the Postmaster General, neither of whom used any expression which implied a restriction of power. On the contrary, the drift of the conversation was to the effect that 1 should exercise any power required. * *
All the powers incident and necessary to carry out the object to be obtained were given.”
' General Cameron, Secretary of War at the time, testifies :
“General Fremont had unlimited power in regard to his .expedition. It was the desire of the War Department that he should succeed. It was the practice of the War Department to give full power to the generals in charge of expeditions. I mean by General Frdmont’s expedition, his operations about St. Louis, and his descent of the Mississippi river. As commander of his department, General Fremont had full power to make contracts, and to do anything to secure success. In my view of his p>owers, he had authority to make contracts for gunboats and mortar boats, and, I presume, to approve them when made by others under his direction ; but I know nothing of any particular case, or of the mode prescribed specifically by law. General Fremont was authorized to get and do all that was necessary to insure the success of his expedition. This power would, of course, include power to purchase and secure steam tug boats and their equipments, and to build tug-boats and steamboats.”
On cross examination, he says:
“As Secretary of War, I should have approved anything that General Fremont would have done in preparing for his expedition. 1 think General Fremont could have gone and bought anything he .wanted. If any informal papers had been sent me, 1 should have *39 considered them binding: full- formal papers ave presumed to be executed.”
Thomas A. Scott, Assistant • Secretary of War at the time, also testifies:
“ I was connected with the War Department at the time General \ Jolm O. Frémont was appointed commander of the western military ^ department of the United States by .the President. General Frémont \ was invested with all the powers which to him might seem needful to i carry forward successfully a]] military movements in his department.” :
The situation of the country and of the department demanded ' quick, prompt, decided measures and movements. Congress had made large appropriations for the purchase of transportation, clothing, and other supplies for the army. To- supply his command with artillery, cavalry, and wagon horses, among other means, he employed John E. Reeside, an admitted expert in buying horses, to go to Cincinnati and there purchase horses in the open market.' The orders issued to Ree-side were as follows:
“HEADQUARTERS WESTERN DEPARTMENT,
“St. Louis, August 11, 1861.
“ Sir : Having confidence in your' knowledge and experience, I - hereby authorize and commend you as inspector of horses for this department, holding you responsible that every animal passed by you shall be equal in value to the price paid.
“ You will be allowed per cent, commission.
“J. C. FREMONT,

“ Major General Commanding.

“ J. E. Reeside, Esq.,

“ Inspector of Horses.”

“Headquarters Western Department,
“ St. Louis, August 10,1861.
“ Sir: You will proceed without delay to Cincinnati, and purchase, cause to be purchased, or insp'ect when purchased by other contractors, two thousand horses, for the service of the army in this department.
“ You will not pay on an average over one hundred and thirty dollars each, at such places as you may name as places of inspection.
“ The horses are required to be suited to the most active field ser *40 vice; not too heavy for activity, nor too light for cavalry; of approved blood, so far as the price will obtain such.
“J. C. FRÉMONT,
“ Major General Commanding.
“John E. Reeside, Esq.,

“Inspector of Horses”

Under these instructions Reeside repaired at once to Cincinnati, purchased a large number of horses, and forwarded them to the quartermaster of the United States army at St. Louis. The quartermaster received them, and gave to the parties from whom Reeside bought them the same kind of vouchers as if he had himself made the purchases. Reeside’s agency in the matter was recognized by the quartermaster, as the following communications, instructions, and orders will show:
“HEADQUARTERS WESTERN DEPARTMENT,
“ St. Louis, August 19, 1861.
“J. E. Reeside, Cincinnati:
“ Funds have been called for to pay for the horses you are now receiving and inspecting. But as yet the funds have not been received. So soon as they are, immediate arrangements will be made to pay the accounts. ,
“ Ship the horses you inspect to Captain P. T. Turnley, assistant quartermaster United States army, St.-Louis.
“ P. T. TURNLEY,
“ Captain, Assistant Quartermaster U. S. Army.
“ Will be found at headquarters.”.
“St. Louis, October 1, 1861.
“ Sir: The contract I made with Mr. G-. A. Sacchi, of New York, (by directions from the general commanding this department,) to deliver at this place by 30th September, 1861, one thousand Canadian horses, has not been complied with by Mr. Sacchi, and npt a single horse has yet been delivered.
“You are therefore authorized to continue to inspect from those furnishing horses in Ohio, Indiana, and neighboring States, (not Canada,) first rate No. 1 cavalry horses, to fill the thousand referred to in Mr. Sacchi’s contract. No higher rates will be paid than the average cost of those you have already inspected.
“Respectfully,
“ P. T. TURNLEY, A. Q. M.
“ J. E. Reeside, Inspector of Horses, Cincinnati.”

*41
“ The United States to J. E. Reeside, Dr.

“1861.
“ From August 11 to November 1, 1861, to services as inspector of horses, in inspecting horses furnished by the following named contractors, and shipped by me to St. Louis, Missouri:
Creain & Higdon, 1, 000 at $127 50. $127,500
Samuel J. Morgan, 500 at 130 00. 65,000
H. O. Gilbert, 207 at 130 00. 26,910
O. H. Geffroy, 170 at 124 00. 21, 250
J. R. Burton, 149 at 125 00. 17, 625
Creain & Higdon, 151 at 130 00. 19,630
2, 177 . 277,915
“ Commissions on $277,915 at 2-J per cent., $6,947 87.”
“ I certify that the above account is correct, and that the services were rendered as stated, and that they .were in accordance with Major General J. C. Frémoñt’s orders to me and to J. E. Reeside, and that the horses were forwarded to me at St. Louis and there received, and were the best lot of horses I have received and inspected in the United States army.
“P. T. TURNLEY, A. Q. M. '
“ Entered:
[“Duplicate.”]
“J. R. COOK, Clerk.
“St. Loins, October 22, 1861.
“ Sir : You are authorized to complete furnishing of horses for Colonel Taylor and Colonel Kennott’s regiments. The horses can he supplied at prices not to exceed one hundred and twenty dollars.
“ Respectfully,
“R. W. ALLEN,
“ Major and Quartermaster.
“ J. E. Reeside, Esq.”
Major Allen, now General Allen, it .will he recollected, became the chief quartermaster of the department of the west after Frómont’s suspension from the command.
On the 14th of October, 1861, Frémont was superseded in the command of the department of the west. Charges of fraud and corruption were freely made against him and others associated with .him through the public press and otherwise. To determine how far the charges of *42 extravagance and fraud were true, and to obtain proper information on the subject, the Secretary of War, by direction of the President, appointed a commission to examine into the affairs and management of the department under Fremont. In the mean time payment of all claims accruing under that administration were suspended. That commission was composed of three gentlemen of the highest character for ability and integrity. The War Department then issued an order, forbidding the payment of any claims contracted under Fremont until they should first have been passed upon by this commission. The time limited for the presentation of claims to the commission was the 10th day of January, 1862.
Several of these claimants came voluntarily forward and presented their cases to the commissioners, and some were examined by them of their own motion from papers and vouchors found in the quartermaster’s office at St. Louis. From all the vouchers presented to them they deducted large sums, alleging that the horses and other material sold and furnished to the officers and agents of Frémont were at higher prices than the same articles could have been procured for.
The commissioners refused to return the papers and vouchers of the claimants submitted to them until they would sign an agreement to receive the amount awarded by the commissioners in full of their claim. Some of the claimants openly protested ; others silently acquiesced. The agreements were signed, the papers delivered to them, and the amount awarded afterwards paid by the United States.
The commissioners in their report say:
“ So soon as we had been sufficiently familiar with the facts presented, and with the principles applicable to them, to enable us to feel entire confidence in the conclusions arrived at, we began to deliver vouchors, certified in accordance with the instructions of the Secretary of War. The first delivery occurred on the 9th day of January, 1862, and has been since regularly continued, as our decisions have been pronounced. In giving out the claims presented, with the allowances upon them, it was necessary that some receipt should be executed by the claimants. In deciding what should be the character of that receipt, it seemed to us that as a protracted and patient examination had been given to these claims, and the parties had been heard either in person or by attorney, and the cases had been continued from day to day, so long as those interested desired to produce testimony, and the government, by our action was committed to pay the amount allowed, it was no more than proper that the claimants should be required to accept the allowance *43 in full for the amount demanded. This co'urse was adopted, and was generally acquiesced in.”
Five of these seven suits are for the amounts stricken off by the commissioners, and payment for which has been refused them. The case of Benjamin Higdon, No. 1,913, for seventy-eight horses, and of John E. Reeside, for his compensation or commissions for buying horses at Cincinnati, were never before the commission.
This is believed to be a fair, succinct statement of the leading and principal facts in these cases, and upon them the United States solicitors allege the claimants cannot recover :
1. Because General Fremont had no authority to make contracts or purchases, and no right to confer that power upon any other.
2. Because the claimants are estopped or barred by the proceedings before the commissioners and their acceptance of the sums awarded, and their receipts thereupon given in full of the entire claims.
On the first point it is contended that a 'commanding general of an army, whatever may be the exigency, cannot under the law make valid and binding contracts for supplies, nor authorize others than theregular quartermasters, commissaries, &c., to do so, however incompetent and inefficient the latter may be. To justify us in holding that to be the law, which must produce insubordination in the service, and may at any time thwart or defeat the best devised plans of a commander, it ought to be plainly and unmistakably written. Congress has beyond all question the right to pass such a law, but the intention to introduce such a crude and mischievous principle should not be inferred from doubtful phrases, or other than express and explicit terms. Let us now proceed to examine, in chronological order, the legislation of Congress upon this subject. Whether these enactments will bear the construction contended for will be best ascertained by careful attention to, and close analysis of, the words and terms employed.
In 1792, May 8, (1 Stat. at Large, 279, ch. 37,) an act was passed making alterations in the Treasury and War Departments, by which it is provided (sec. 5) “that all purchases and contracts for supplying the army with provisions, clothing, supplies in the quartermaster’s department, military stores, Indian.goods, and all other supplies or articles for the use of the Department of War, be made by or under the direction of the Treasury Department.” This act clearly shows, by intendment, that prior to its passage the Secretary of War had authority, under the general terms of the statute of 1789, to make these contracts.
This is also apparent from an act of 1798, (1 Stat. at Large, 610, *44 ch. 85, sec. 3,) wbicli repeals the act of 1792, and directs that “ all purchases and contracts for supplies and services for the military service of the United States shall be made by or under the direction of the chief officer of the Department of War.”
In 1809 a statute was passed (2 Stat. at Large, 535-6, ch. 28,) which provides (sec. 5) that all purchases and contracts for supplies or services which are, or may according to law he, made by or under the direction of either the Secretary of the Treasury, the Secretary of War, or the Secretary of the Navy, shall be made either by open purchase or by previously advertising for proposals respecting the same.
In 1813 a statute was passed entitled “ An act the better to provide for the supplies of the army,” &c., (2 Stat. at'Large, 816, ch. 48,) one object of which was to provide for the subsistence of the army, by purchase or contract, or by the use of supplies on hand, “in all cases where, either from any want of contractors or from any deficiency on their part, or from any other contingency, such measure may be proper and necessary in order to insure the subsistence of the army or any part of it.”
This is evidence of a clear intent that the subsistence of the army shall not be defeated by the want of contractors, or by an inability on their part to perform their contracts, or from any other contingency or disturbance.
Tn 1818 a temporary statute was passed, (3 Stat. at'Large, ch. 61, sec. 7,) by which it is provided “ that supplies for the army, unless in particular and urgent cases the Secretary of War should othenoise direct, shall be purchased by contract to be made by the commissary general on public notice; which contract shall be made under such regulations as the Secretary of War shall direct.” The section referred to was, on the 23d of January, 1823, (3 Stat. at Large, ch. 5, p. 721,) and on the 2d of March, 1829, (4 Stat. at Large, ch. 42, p. 360,) severally continued for the period of five years; and on the 3d of March, 1835, until the same should be repealed by Congress.
In 1820 a statute entitled “ An act in addition to the several acts for the establishment and regulation of the Treasury, War, and Navy Departments” was passed, (3 Stat. at Large, 567-’S, ch. 52, sec. 6, May 1,) which provides, ‘‘ that no contract shall hereafter be made by the Secretary of State, or of the Treasury, or of the Department of War, or of the Navy, except under a law authorizing the same, or under an appropriation adequate to its fulfilment; and excepting also contracts for the subsistence and clothing of the army or navy, and *45 contracts by the quartermaster's department, which may be made by the Secretaries of those departments.”
In 1858 a statute was passed, (11 Stat. at Large, pp. 266, 269, cb. 25, see. 4, May 4, 1858,) which makes it tbe duty of the Secretary of War and of the Navy to report to Congress, severally, such contracts as they might make under section 6 of the law of 1820.
In 1860 a statute was passed, making certain appropriations, (12 Stat. at Large, pp. 91,103, ch. 205, sec. 3,) which provides “that all purchases and contracts for supplies, when the public exigencies do not require the immediate delivery of the article, or performance of the service, shall he made by advertising a sufficient time previously for proposals respecting the same. When immediate delivery or performance is required by the public exigency, the articles or service may he procured by open purchase or contract, at the places and in the manner in which such articles are usually bought or sold, or such services engaged between individuals. No contract or purchase shall hereafter be made trnless the same be authorized by law, or be under an appropriation adequate to its fulfilment, except in the War aiid Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the eur-rent year.”
The third section of this act was repealed March 2, 1861; hut its provisions were re-enacted in the same terms. (12 Stat. at Large, 220, ch. 84, see. 10.)
By the'fourth section of the act of 28th March, 1812, (2 Stat., 696,) Congress provided for the appointment of a commissary general of purchases and as many deputies as, in the opinion of the President, the public service might require. The fifth section of the same act defines the duties of this officer to be, under the direction and supervision of the Secretary of War, to conduct the procuring and providing of all arms, military stores, clothing, and generally of all articles of supply requisite for the military service of the United States.
And it shall be the duty of the deputy commissaries, when directed thereto either by the Secretary of War, the commissary general of purchases, or, in cases of necessity, by the commanding general, Quartermaster General, or deputy quartermasters, to purchase all such of the aforesaid articles as may be requisite for the military service of the United States.” By the act 23d August, 1842, sec. 3, 5 Stat., 308, the office of commissaiy general of purchases was abolished, and the *46 duties were to be performed by tlie officers of the quartermaster’s department.
These are all the statutory provisions relating to contracts for military supplies that have any bearing upon the questions involved, that I have been able to find, that were in force when these contracts were made. The want of an appropriation by Congress cannot be alleged, as, on the 17 th day of July, A. D. 1861, Congress appropriated §10,514,500 for the purchase of horses. 12 Stat., 262. Nor was it necessary that there should have been even a law authorizing such purchases, or an appropriation for their payment; for it will bo seen that under the provisions of the act of Congress of 2d March, 1S61, (12 Stat., 220, ch. 84, sec. 10,) that contracts and purchases ‘‘ in the War and Navy Departments for clothing, subsistence, forage, fuel, quarters, or transportation,” are excepted out of the prohibitory clause forbidding contracts or purchases thereafter'from being made, “unless the same be authorized by law, or be under an appropriation adequate to its fulfilment.” This is almost a literal transcript of the act of 1st May, 1820, above quoted, except that it provides that these excepted contracts and purchases shall be made by the Secretaries of those departments. The act of 1S61 leaves them to be made as other contracts and purchases, and by the same agents and officers.
The main grounds, as I understand them, of the objections to the recognition of the contracts, in the present cases, are :
1st. That Fremont, as commanding general of the district, had no authority to make any contracts or purchases binding the United States, nor had he the power to designate or appoint any person who could exercise such authority, but was obliged to rely on the quartermasters of his army entirely to perform that service.
2d. That the contracts and purchases were void because no proposals were published and bids invited for furnishing the supplies, and no exigency existed which brought the departure from that provision within the exception in the act of Congress.
I. This ground, of course, assumes that there is something clear, explicit, and positive in the law or enactments of" Congress, which either divests a commander, situated as was General Fremont, of such power and authority, or confers them exclusively upon others. Is there anything in the acts of Congress which prohibits in any way the commanding general of an army from binding the United States for the needed supplies for his troops ? I have been able to find nothing of the kind, and none has been brought to our notice. Is there anything in the general usage of armies and nations which favors the *47 objection ? On the contrary, it has ever been held that the loans contracted, the supplies purchased, the stores taken from others than public enemies by order of the commander of an army or expedition, are proper and legitimate charges against the government he represents. And this is so without regard to whether the parties from whom the supplies were purchased or taken were citizens or foreigners. Is there anything in the usage of the War Department or our own government that sustains the position 1 None has been proved or shown, and so far as the practice and usage of the War Department is known, as matter of notoriety and history, it has been against the view taken. Not, indeed, so much as matter of usage as,a matter of construction given to the acts of Congress, as well as growing legitimately and necessarily out of the constitution; organization, and discipline of an army. The Secretary of War, as the executive and administrative head of the military establishment, has always directed, supervised, and controlled the contracts and purchases to supply the army, except during the interval between May 8, 1792, and July -16, 1798. An act of tbe former date, quoted above, provided that supplies for the department of war he made under the direction of the Treasury Department. The act of 1798 repeals that of 1792, and enacts that “all contracts and purchases for supplies and services for the military service of the United States shall he made by or tinder the direction of the chief officer of the Department of War.” This act remains in force to the present day. It has neither been repealed nor supplied by any later enactment. For nearly seventy years the Secretary of War has continued to exercise the power of making contracts and purchases either with or without the intervention of quartermasters, commissaries, or ordnance officers. His right and power in the premises, so far as I know or have been able to discover, have never been doubted, much less disputed, until now. Nor, indeed, could they well be called in question, for the enactment is so plain, direct, and positive that its meaning cannot well be misunderstood or misinterpreted. They “shall be made by or under the direction of the chief officer of the Department of War.” The act of 1812, which established the office of commissary general of purchases, does in no way abridge or curtail the powers of the Secretary. His duties are defined to be “ to conduct the procuring and providing of all arms, military stores, clothing, &c., requisite for the military service of the United States.” But he can only do these things “under the direction and supervision of the Secretary of War.” The a6t was doubtless intended to lighten the labors of the Secretary, while it reserved to him the whole power conferred *48 by tlie act of 1798. That a matter of such great importance to the service should not be left in doubt, the same act expressly provides that the commissaries shall, under the Secretary of War, the commanding general, or Quartermaster General, make all such purchases as are necessary for the military service. By the act of 1842, the duties of the commissaries were devolved upon the officers of the quartermaster’s department without any change in their powers or those of the Secretary or commanding general, up to the date of these transactions. Hence it will be seen that from the plain enactments of Congress the officers of the quartermaster’s bureau, in making contracts or purchases, do so as the aids or assistants of the Secretary. They are under his direction, supervision, and control. lie may act through them or make his contracts and purchases directly and without their intervention; or he may direct them to make any particular contract or purchase in any way, form, or manner he may choose. They are his staff — his clerks — nothing more. Now, what the Secretary can do himself, or can order the Quartermaster General or any of his subordinates to do, he can do through or by any other agency he may employ. Instead of going in person to a -horse market and purchasing animals for the service, he could send an expert to do it for him, qui facit per almm, facit per sc. It would still be a purchase by the Secretary. So he could send an experienced armorer to purchase ordnance stores. It would nevertheless be his own act. Or a clothier or merchant to select and procure clothing for the service. It comes within that universal rule of construction that whatever is done by the orders and under the direction of a high official, is to be regarded and held as his own proper act, otherwise the infinite number and variety, the endless perplexities, complications, and details of such a place as the Department of War would overwhelm any ordinary mortal in a single day.
A general commanding an army in the field occupies pretty much the same position to that army that the Secretary of War does to the general service, especially where that army is to be raised, organized, armed, and equipped at a remote point. The quartermasters in his command are his subordinates and his aids. What they do they must do subject to his will and as he directs. Whether it relates to the procuring, issuing, or distributing supplies, his commands are the law to them. They are under him and responsible to him, and he to the government. Such has been the understanding and practice of the government; such the construction of the law by the distinguished Quartermaster General of the United States, General Meigs. Writing in reference to the very purchases in. dispute here to Hon.F. P. Blair,
*49 jr., on tlie 28th August, 1861, he says: “There may be reasons of time, of quality, which induce a general to order a purchase at a higher rate ; and while I communicated to the. quartermaster as to the ruling prices of horses, the market rates, I called upon the treasury to send all the money he asked for. Tell General Fremont that no man more than myself desires to sustain him; no one is more ready to take the responsibility to assist him, and that he has, in my opinion, already the power which you say ought to be conferred upon Mm by tbe President. Whatever a general commanding orders, the subordinates of" • his staff are, by regulations, compelled to do if possible. ■ ' “
country. The country will he very careful to approve his measures, and will judge his mistakes, if any, very tenderly, if successsful. Success crowns the work, and let him spare no responsibility, no effort to secure it.”
or as contended for by those who hold that General Frémont could not make any contracts or purchases, we should have the strange anomaly and contradiction that an officer intrusted with the fate of an army and the honor of Ms flag and country is liable, at any time, to have his plans thwarted, his expedition de- , layed, success turned into ruin and. disaster, by the incompetency or /' wilful neglect of a quartermaster. If the law has vested the whole power * and authority in the quartermaster, he may not interpose his orders as commander to compel such officer to get certain supplies, or by a certain time, or in certain quantity. For that admitted, yields the whole point. If the commanding general may direct a quartermaster to contract for, or to purchase in open market, supplies of specified kinds and. grades, and to certain amounts, and by a certain time, what power is left in the quartermaster? None whatever. He becomes that which he was intended to he — merely the clerk, agent, or instrument in the transaction of the business, while the commanding general is the depositary of power, and the moving, controlling, and directing l spirit of the organization. Such I conceive to be tbe ordinary powers i of a commander of a department or an army. B ut General Frémont was j intrusted with extraordinary powers. As will he seen by the testimony >! of General Cameron, then Secretary of War, Frémont was invested with unlimited authority in regard to his department. The testimony of Colonel Scott, Assistant Secretary of War, is to the same effect. Whatever powers the President and Secretary of War possessed they conferred upon General Fremont within his district or department. !_ Much has been said about the war powers of tbe President. But such 1 *50 powers are a myth if they are so limited and circumscribed that lie cannot confer upon a commanding general of a department the power buy a few horses to mount his cavalry, or transport the supplies of army. But it is not so. He had full and plenary powers. The proof that they were conferred is full and explicit, and there is nothing the law to forbid him from exercising them in the manner he did.
As to his department he occupied the same position the Secretary did to the general service; that is, ho was to exercise all the lawful, all the war powers of the President, in organizing, arranging, and supplying his expeditionary army. It it is said that though he cotfld not do these things himself he could order his quartermasters to do them. He could designate the kind and quality of articles he needed and the time within which they should be supplied — and if the officers receiving such orders failed or refused to execute them, they would ■ be liable to punishment. This admission, I think, yields the whole argument; because if he could do all this it placed the whole subject under his control, direction, and supervision, and the major always includes the minor. The misapprehension that exists upon this subject arises, I think, mainly from the want of a clear and full comprehension of the object and purposes of the birreaus in the War Department, of the quartermaster, commissary, ordnance, &e. They are not so much intended to make contracts and control the purchases as they are constituted for the proper distribution and accountability of the property after it has been procured. The Secretary of War or the commanding general procures supplies, and passes them into the hands of the quartermaster’s or commissary’s department, that they may be properly and securely kept, that they shall be legally distributed, that proper vouchers shall be taken for them, and that clue accountability shall be maintained.
II. It is alleged, moreover, that the contracts were void, because the purchases were made in the open market, and without previously advertising for proposals. And it is further alleged and assumed that there was no such exigency as justified a departure from the contract system. The act does not prohibit purchases from being made in another way, nor make void contracts or purchases made without such advertisements. It is a rule prescribed for the officer intrusted with getting such supplies, but is not a condition or element of the contract. It does not preclude parties selling to an authorized agent or officer of the government, in open market, from recovering the agreed price, in the absence of all fraud and collusion.
The acts of Congress require that a clause shall be inserted in all *51 contracts declaring that no 'member of Congress is interested in it. Nobody believes that its omission destroys or invalidates the contract. The officer making it violates his duty, and renders himself liable to the animadversion of ]|is government for the delinquency; but it would not affect the obligation if in fact no such interest existed. So a copy is required to be filed in the returns office. Suppose it is not done, would that render the contract void ? These are all duties to be performed by the government’s own officers and agents, like the question of deciding whether they will advertise or buy in open market, and with which the other party has no concern whatever.
What is that public exigency which requires immediate delivery of articles, or performance of service, which justifies dispensing with the advertisement ? Who is to decide whether it exists ? When the Secretary of War or a commanding general goes into the market to buy supplies, must every seller of a horse, a bale of hay, or barrel of beef decide at his peril whether the exigency exists or does not ? If he decides right he gets his-pay, provided the court before which he sues years afterwards, knowing as little about the exigency as he did, should agree with him in opinion. If he happen to be unfortunate in these respects, the United States get his property, and he’ gets their maledictions in return. The incongruity and injustice of such a doctrine are too glaring and apparent to require refutation. To form a correct conclusion upon the question of whether the exigency exists or does not, would require an amount and accuracy of information possessed only by a few of the high officers of the government. That exigency, too, in time of war, when it would be most likely to occur, might be founded upon information and facts which it would be hazardous or disastrous to reveal. The safety of the army, or the highest considerations of public policy and welfare, might require this information to be kept secret. Yet if every shopkeeper, trader, merchant, and horse dealer from whom you seek any supplies must form his judgment and act at his peril, you are bound in honor and justice to disclose to him the real, actual state of affairs. I cannot impute to Congress the intention to enact anything so void of either sense or justice, without at least some words or terms to justify such an interpretation. An exigency exists when, from any cause, it is necessary for the good of the public service that the articles should be procured or service performed without any delay. To determine it properly and intelligently requires a view of all the facts and circumstances out of which it arises. It is a pure military question so far as it relates to the army. Who shall decide it ? Who shall decide whether an army shall advance or re *52 treat 1 — whether it shall offer battle to the enemy, or decline the conflict? No one doubts that it is the right and duty of the commanding general, the highest military authority present, to decide these momentous questions. The fate of an army, the honor o^ a nation, the liberties of a people may all hang upon that decision. His competency is not doubted. But when it comes to what may affect the cost of beef or bacon by a penny a pound, or the price of a horse by a dollar or two a head, it is alleged to be a power which cannot safely be intrusted to his hands.
In resorting to this mode General Fremont opinions of Quartermaster General Meigs, expressed in the same letter from which I have before quoted, ho says :
“ In regard to advertising ulations expressly provide that in case of public exigencies supplies are to be bought in open market as between individuals. Exercise this power. Moreover, advertisement or public notice does not require postponing opening of bids for a month, or a week, or two days. If forage, wagons, horses are wanted, the law, the necessity, are fully met by putting a notice in the papers, and purchasing as fast as the offers come in. The next day, or the same day, take the then lowest bidder or the then most advantageous offer. The day after you will have a still better offer; lake that for a portion of your supplies, and so on till you have all you need. By this system I have brought down the price of horses from $138 to $130, of wagons from $111 to $108, since I came hero, and have got abundant supplies.”
1 think I shall be able to show that there was such an exigency as justified a resort to the open market, decided right. But whether right or wrong can be of no importance in this case. The purchases were made upon the faith of the government, and the only question is whether the parties who sold to the government should be paid the agreed price. The United States received all the property; there is no fraud alleged against the sellers, the claimants in the cases; nor of any undue advantage having been taken of any of the officers or agents making the purchases. Besides, the evidence, in my judgment, greatly preponderates that the price of the horses was not too high according to their kind and quality.
When Fremont was sent to take command of department west in July, 1861, it was a critical and trying period in the history of the country. It was a time of great and overwhelming anxiety and solicitude to all loyal men. The rebellion was assuming vast and dangerous proportions. The national arms had met with recent checks *53 and disasters. Quick, prompt, decisive measures bad been determined upon by tbe President. A large army was to be organized out of tbe western quotas of volunteers. That army was to be armed, equipped and ready for tbe field in tbe shortest possible space of time. This was considered absolutely necessary, as well to save tbe loyal States from threatened invasion by tbe rebel armies, as to carry tbe war into tbe insurrectionary territory. Frémont was charged with this great duty. Tbe President and Secretary of War clothed him with all tbe requisite power and authority to perform that duty; for everywhere in official life duty and power go band in band. Wherever a duty is imposed tbe power to perform it is conferred, and tbe higher and more important tbe service, tbe larger tbe powers and tbe wider tbe discretion necessary to its accomplishment. When a government holds a general responsible for tbe conduct and efficiency of bis troops and tbe success of bis campaigns, it at tbe same time invests him with all tbe requisite powers by tbe exercise of which these results may be achieved. Among these none could be more important, nay essential, than tbe right, promptly and without any interference, to procure tbe necessary supplies. Could a general, placed in such circumstances, excuse bis failure to move at tbe proper time or in tbe right way, by alleging that bis quartermasters had failed to furnish tbe necessary supplies for tbe army. Tbe reply would instantly be at band: these officers were bis subordinates, and that, instead of their remissness excusing him, be was actually responsible for their misconduct.
Tbe United States, reposed a great trust in General Frémont. They held him out to tbe nation and tbe world as possessing all tbe powers of tbe President and Secretary of War in regard to tbe organization and supplies of bis army. In consequence of that, citizens parted with their property, not on tbe credit of General Frémont’s name, but on tbe faith of this great nation. Can this government now repudiate these contracts? If these contracts were fairly and honestly entered into — and there is not a scintilla of proof that they were otherwise — the honor and faith of tbe nation would be greatly damaged by such repudiation. The searching investigations of tbe St. Louis commission and of tbe congressional Committee on the Conduct of the War, and tbe close and sifting examinations of tbe solicitors in these cases, have failed to show any corruption, or bring home any fraud to tbe parties in these cases. That in such efforts it has not been discovered, is at least presumptive proof that it does not exist.
In this court we bold claimants to tbe same strictness in tbe performance of their contracts with tbe United States as-if the-transaction. *54 were between individuals. However severely the rule may operate, we do not depart from the fair import and meaning of the agreement, unless in such cases where equity would afford relief. They should he as inviolate on the other side. Every man who enters into a business transaction with the United States should feel and know that the contract will not only he enforced against him, but will be observed in his favor. Sound morality and public policy will alike be promoted by the strict observance and impartial enforcement of business engagements of the United States on both sides. Any other rule will work mischief to the government or injustice to the citizen. It will drive honest, fair-dealing men from government business and contracts and leave the national treasury a prey to the reckless and unscrupulous. In these cases I think the United States bound in all honor and conscience, by every consideration of right and justice, to the fulfilment of these contracts. The paltry sum saved by a refusal will be but a wretched equivalent for the breach of public faith, the demoralization it occasions, and the reprisals it is always sure to provoke.
II. It is finally urged upon us that though these contracts may have been originally valid and binding, the claims made upon them are barred by the proceedings under the Holt-Davis commission, and the acceptance by several of these claimants of the amounts awarded them by that board, and giving receipts in full for their entire claims. These facts have been pressed upon us earnestly in various aspects. 1st. As an arbitrament and award; 2d, as accord and satisfaction; 3d, as a compromise of doubtful and disputed rights.
1. It has no feature whatever of a submission to arbitration. The commission was an ex parte one; constituted not to decide upon the validity and amount of the claims, but as to the facts and circumstances surrounding the transactions out of which they arose. It was intended to elicit facts instead of reaching conclusions or producing final results. Arbitrament always implies mutual submission of the dispute. In our case it is totally wanting. But if there had been even a concurrence in the submission by the claimants it would still he unavailing; for, to render an award binding- on either party, it must be equally obligatory on both. The Secretary of "War had no power to submit the rights of the United States to the arbitrament of private and unofficial persons. He could only adjust the claims against his department through the agencies constituted by the law, or through the judicial courts of the nation. There was no law authorizing him to make and constitute such a tribunal. Hence their decisions and reports, whatever .light they may have cast upon the transactions or information *55 imparted to tbe department and the Secretary, had no binding force and efficacy. None upon the United States, because no law of Congress had authorized their acts; none upon the claimants as an award, because of the absence of all reciprocal obligation or mutuality. Congress alone has the power to submit the rights of the government to arbitration, or, at least, to prescribe the mode and manner in which it shall be done. (See Kendall v. The United States, 12 Peters, 611.) As an award, if otherwise good, it was not binding on the United States when made, and of course not on the claimants. That Congress impliedly ratified the finding, by directing the amounts found due by the commission to he paid, could not alter the case, as it could not relate hack and make that binding on the claimants which before was simply void as to both. But it never was regarded by the Secretary of War, Congress, or the claimants, in any other light than as an ex parte affair, adopted as the best means that suggested itself of getting full and accurate information to guide the future action of the department in adjusting or contesting the claims.
But let us test this question a little closer. Suppose this commission, instead of deducting a large sum from the contract prices had added the same amount to them, and these suits instead of being brought upon the contracts were'upon such awards, and the position of the parties be thereby reversed, the United States defending under the contracts instead of now under the award, how would the matter standi Could the award in such case be sustained? Clearly not. And this answers the whole argument; because, if available as a defence now, it would in the other case ho equally so as a ground of suit.
2. To support an allegation or plea of accord and satisfaction there must be some new consideration moving from the party who sets it up. The payment of a part of a debt, in consideration of the creditor relinquishing the residue, where the debt is due at the time, will not support the plea or averment. (Warren v. Skinner, 20 Conn. Rep., 559, 1 Bac. Ab., 43.) To sustain a release not under seal a consideration of some kind, apart from the original indebtedness, is necessary; and without such consideration it is nudum, pactwm, and void. In support of this principle there is ah overflowing flood of authorities, without sufficient counter-current to make an eddy in the stream, or a ripple on its surface. The ease of Wentz v. De Haven, (1 Sergt. and K., 312,) cited by the solicitor, which intimated a contrary doctrine, has been repeatedly overruled by the same court which inadvertently made it. (Whitehill v. Wilson, 3 Penn. Rep., 405; Campbell’s estate, 7 Barr, 101; Kennedy v. Barr, 445; Kidder v. Kidder, 9 Casey, 268.) *56 There is scarcely a State in the Union where it has not been repeatedly decided that a receipt in full is but prima facie evidence of payment; and that, as between the parties to it, such receipt may he explained, varied, or contradicted by parol. It is equally well settled that part payment of a debt is not sufficient consideration to support a release of the residue, or an agreement not to sue for it. To cite even a tithe of the cases in which this doctrine is maintained and enforced would swell this opinion beyond due bounds. A few will suffice. The leading case, upon which the others are all grounded, is Pinnel’s case. (5 Rep., 117.) In that case “it was resolved by the whole court that payment of a lesser sum on the day, in satisfaction of a greater, cannot be any satisfaction for the whole, because it appears to the judges that, by no possibility, a lesser sum can be satisfaction to the plaintiff for a greater sum.” “ When the whole sum is due, by no intendment the acceptance of a parcel can be satisfaction to the plaintiff.”
This case was followed and the principle sustained by Pratt, C. J., in Cumber v. Wane. (1 Strange, 426.) And again, more explicitly, by Lord Ellenborough, in Fitch v. Sutton. (5 East,., 232.) “But it cannot be pretended that a receipt of part only, though expressed to he in full of all demands, must have the same operation as a release. It is impossible to contend that acceptance of ¿£17 10s. is an extin-guishment of a debt of ¿650. There must be some consideration for the relinquishment of the residue; something collateral to show a possibility of benefit to the party relinquishing his further claim; otherwise the agreement is nudum pactum. But the mere promise to pay the rest when of ability put the plaintiff in no better condition than he was before. It was expressly determined in Cumber v. Wane that acceptance of a security for a lesser sum cannot be pleaded in satisfaction of a greater. That decision is directly supported by the authority of Pinnel’s case, which never appears to have been questioned.”
From this ruling there has scarcely been a departure up to the present day in England, where it is firmly established. And this same principle has been followed, as already stated, in nearly every State in the Union, its sound sense and justice commending it to the judgment and conscience of courts everywhere and at all times. A few of the American eases are here referred to, which will be found to sustain the doctrine to the full extent to which I apply it in this case: Sigourney v. Sibley, 21 Pick., 101; Miller v. Hemgler, 5 W. and S., 486; Lawrence v. The Schuylkill Navigation Company, 4 W. *57 C. C., 526; Maize v. Miller, 1 ibid., 328; Hope v. Johnson, 11 Rich. L., 199; Kidder v. Kidder, 9 Casey, 268; Pabodie v. King, 12 John., 426; Gushing v. Wyman, 44 Maine, 121; Ryan v. Rand, 6 Fost., (N. H.,) 12; Frink v. Bolton, 15 Ill. Rep., 343; Jones v. Rickets, 7 Md. Rep., 108; Hardy v. Coe, 5 Gill, 189 ; Bailey v. Day, 26 Me., 88; Miller v. Holden, 18 Vermont, 337; Mason v. Peters, 4 id., 101; and Wheeler v. Wheeler, 11 Vt., 60.
A careful review of the English and American authorities will demonstrate, beyond all controversy, that there is no case of recognized and established authority that contravenes the principle we apply in this case. "Whenever the rule and the principle have apparently been departed from, it will be found that the debt or demand was uncertain and unliquidated. Wherever, as in our eases, the amount of the claim or debt is definite and certain,-the principle is invariably applied. In such cases as are unsettled, where the parties come together and agree to settle and liquidate the demand at a certain amount, and it is paid and received in full satisfaction, in good faith, it will be sustained as accord and satisfaction, or a compromise. In the cases we are considering there is nothing for such a doctrine to operate upon. They were not open, unadjusted, unsettled claims that the claimants held. They were regular official vouchers, given by the quartermasters, stating in words and figures the amount due the parties, or were distinct written contracts specifying precisely the amount to be paid for materials furnished or services performed. So these claims are treated by this commission. The amount of the vouchers of the claimants, or of their contracts, is plainly set down. From that amount a certain sum is arbitrarily deducted, and the proposition made, “Take this less sum in satisfaction for the whole, or get nothing.” It is taken and a receipt in full given, or an agreement signed not to sue for residue. Now where is the consideration for this promise? The demand was specific. The United States has so treated it in every instance. The debts were due and overdue in all the cases. What the claimants received was admitted to be due to them, irrespective of this arrangement. Where, then, is the least spark or tittle of consideration to support and sustain these pretended releases, or accords and satisfaction ? Without regard to the manner in which they were wrung from the fears or necessities of the claimants, they are as bald and naked promises as could be presented to the consideration of a court. It is not pretended there was any new consideration. There was no change of time, place, or mode of payment. It was simply an agreement to *58 receive a part in place of tbe whole of a specific liquidated claim. As such it is entirely without any binding force.
3. The facts set up, it is alleged, if they do not constitute an award, a release, or accord, they amount to a compromise of a doubtful and disputed right. Where a party voluntarily and without any oppression or undue influence being exercised upon him by the other, relinquishes a part of a disputed claim and accepts the less sum in discharge of the whole, it is binding on him as a compromise. It is quite clear that where a dispute arises between two parties as to the validity or amount of a claim, and they in good faith mutually agree to pay and receive a certain sum, or such sum as a third party shall award, and it is voluntarily paid and accepted in discharge of the whole claim, that it is a final and binding compromise which neither will be permitted to gainsay or reopen. But such are not the facts of the cases we are considering. To make an agreement of compromise effectual it must be fair, open, and free from undue influence, oppression, and extortion. The parties must stand upon equal grounds Not so in our cases. This alleged compromise commences and has its inception in the appointment by the War Department, without the knowledge and consent of the claimants, of this one-sided commission. Their cases are taken up either voluntarily or by compulsion. Where the party does not submit his vouchers, his claim is seized upon by the records of the quartermaster’s department. The amounts are arbitrarily fixed, their papers are withheld, and they are reminded that unless they take what is offered they can neither have their papers nor the money that is admitted to be due to them. This is the compromise. They agreed to it because they were compelled to do so.
It is admitted that the claimants had no voice in the selection of these commissioners, who are now called arbitrators. They did not, either before or after the report was made, agree that they should act as referees or arbitrators on their rights. They entered into no stipulation to abide by the report or award. They did more — they protested against the injustice of the decisions, and the sequestration of their vouchers and papers. It is admitted the commissioners had no right, in any view, to withhold the papers, least of all for the purpose of compelling an unwilling submission to their finding. Yet they did withhold them, and for the very purpose avowed, and apparent of forcing an acquiescence in their decison. They succeeded in obtaining that submission and acquiescence. Is this arbitrament and award? Is this-accord and satisfaction? Is it compromise? The rack and *59 torture often produced similar submissions — tbe like compromises — but littl'e less odious, and not a wbit more unlawful.
It was at one time maintained that duress of the person was necessary to avoid an agreement, and that duress or detention of goods would not have that effect. That doctrine is now exploded. The case of White v. Heylman (10 Casey, 142) closely resembles the one in hand. There Heylman refused to deliver to White certain deeds and papers belonging to the latter, until he would pay him $300 in money, and give his note for two hundred more. The action was on that note. Mr. Justice Read says: “ Neither the payment of the cash nor the giving of the note was voluntary, but both were extorted from the defendant, and came within that class of cases in which money illegally claimed and paid has been recovered back, where goods, deeds, or papers have been wrongfully withheld until the money has been paid.”
In Ripley v. Gelston (9 John’s Rep., 201) it was held that duties illegally exacted by a collector of customs before he would deliver the goods could be recovered back from him, although he had paid the money over into the public treasury. So in Clinton v. Strong, (19 John, 370,) of costs illegally exacted by an officer.
In Wheeler v. Smith (9 How., 55) the Supreme Court of the United States set aside an alleged compromise, on the ground that the party setting it up had taken an unfair advantage of the other’s necessities. Mr. Justice McLean says, on pages 82, 83: “But in making the compromise the parties did not stand on equal ground. The necessities and character of the complainant were well known to the executors.”
In Elliott v. Swartwout, (10 Peters, 137) the same court holds that duties or taxes illegally exacted by an officer, before he would deliver the parties’ goods, were not voluntary payments, and could be recovered back. (Hearsay v. Pruyn, 7 John, 179.)
In Ashmole v. Wainwright (2 Queen’s Bench Rep., 837) a common carrier refused to deliver the plaintiff his goods until he paid a sum in excess of the legal freight. He paid the sum demanded, protesting against it as exorbitant. The court held he could recover it back in assumpsit.
So in Wakefield, v. Newbon, (6 Queen’s Bench, 281,) an attorney of a mortgagee had possession of certain title deeds to which the mortgagor was entitled. The attorney refused to deliver up these papers to the mortgagor until he would pay certain costs and expenses, for which he was not legally bound, and the attorney had no right to demand. . He paid the money, got possession of his papers, *60 and then brought suit to recover it back. Lord C. J. Denman said :
“ The evil of allowing extortion, by means of a wrongful detention of goods, would be great; and the wrongdoer has no right to complain when he is compelled to restore money which he was warned he had no right to exact. The case is wholly different from that class of cases where the parties have come to a voluntary settlement of their concerns, and have chosen to pay what is found due.” (Cartwright v. Rawley, 2 Esp., 723.) The same principle is decided and maintained with great clearness and force by Chief Justice Tindal, in Parker v. The Great Western Railroad Co., (7 Mann and Gr., 253.) Also, by the superior court of New York city, in the case of Harmony v. Bingham, (1 Duer, 229,) and by the Court of Appeals in 2 Kern, 99.
In Shaw v. Wood (7 Barn. & Cress., 73) the property illegally withheld were certain policies of insurance, upon which the party holding them claimed a lien. The owner, to get his papers, paid the amount, and sued to recover it back. The court repudiated the idea of it being a settlement or compromise. It was simply an illegal extortion. S. P. Astley v. Reynolds, (2 Strange, 915) Atlee v. Backhouse, (3 M. & W., 643.) The same docrine was held and distinctly announced in the case of Oates v. Hudson, (5 E. L. and E. Rep., 469.)
In the case of Astley v. Reynolds (2 Str., 915,) the court says: “We think, also, this a payment by compulsion; the plaintiff might have such an immediate want of his goods that an action of trover would not do his business. Where the rule volenti non jit injuria is applied, it must be where the party has his freedom of exercising his will. To the same effect is Chase v. Dwinel, (7 Green, 134,) and numerous other cases.
The arguments relied on here, that the claimants need not have acquiesced in the demands made by the commissioners — that they could have sustained suits in this court without having possession of their papers, is the old defence that has been urged in all the cases cited and overruled in each of them successively. In all such cases the party can maintain trover and conversion for his goods, and detinue for his title deeds or papers; but that fact does not vary the principle. The other party shall not be permitted to take advantage of, and reap a benefit from his own wrong. It is a great fallacy to suppose that to render a promise or agreement, extorted by the detention of goods or papers, unavailable and void, the other party must have been without any other remedy. The doctrine I am contending for, and the cases cited in support of it, do not rest upon any such grounds, but upon the illegality of the means by which the promise was obtained, or the *61 agreement exacted. To present to a man the alternative of paying an extortionate sum, or of relinquishing a legal right on the one hand, or be deprived of the rightful possession of his property, or obtain it through the delay, vexation and expense of a lawsuit on the other, the law holds to be unconscionable and unlawful, and renders every promise and agreement extorted in that way wholly null and void. In our cases it is not disputed that the claimants had a right to the possession of their papers; nor was it- disputed that they were entitled to be paid the amounts which they afterwards received. And in view of these facts, we are called upon to decide upon the legality and justice of withholding these papers, and the money due them, until they should agree to relinquish all claim to such part as the United States saw fit to dispute. This question has never been decided but one way by any respectable court in Christendom, holding that common honesty and fair dealing require that a party shall be relieved from any bargain wrung by such means from his weakness or necessities.
. Leaving out of view entirely the withholding of the vouchers and papers, neither the legal nor moral aspect of the case is changed. It is not the law, nor is it in accordance with my views of sound morals, that whore a party has a claim against another of, say, three hundred dollars, who admits that he is justly indebted in the sum of two hundred dollars, but refuses to pay it or any part of it unless the other will agree to relinquish his right to demand the balance. The debt is due; that part is undisputed. The creditor is entitled to it, without any reservation or condition. And where the other exacts and he, to obtain it, gives a receipt in full for the entire claim, it is neither a release nor a compromise, but simply a promise, made not only without any consideration, but tainted with such illegal and inequitable conduct as renders it inoperative and void. Such, in my opinion, is the character of the receipts set up in these cases. It would be against all law, against all precedents, to sustain this as a compromise, and derogatory to the character of a great and just government, to allow such a state of facts to defeat the just claims of its citizens.