# CLARK *v.* MATHEWSON.

EQUITY JURISDICTION ; LANDS OF LUNATICS.

A court of equity in this District has no jurisdiction to decree the sale
of lands of a lunatic for the purpose of better investment.

No. 508. Submitted October 23, 1895.   Decided January 6, 1896.

HEARING on an appeal from a decree confirming a sale of
lands of a lunatic and requiring appellant as purchaser to
comply with the terms of sale.   *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Henry P. Blair* for the appellant.

D. C.]                    Opinion of the Court.

*Mr. Wm. Stone Abert* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

This is an appeal by the purchaser at a judicial sale from an order confirming the same and requiring him to pay the purchase money.

The history of the case may be briefly stated. Arthur Mathewson, the husband and committee of Harriet S. Mathewson, a lunatic, filed his bill in the Supreme Court of the District, praying an order of sale of certain lands belonging to her. It was alleged that the lands were unproductive, and that their sale and conversion into money for investment would be greatly to the advantage of the lunatic. The proof was ample to sustain the allegations of the bill, and there is no doubt that the bill was filed in perfect good faith and with the fairest intentions. An order of sale was made June 10, 1893, and William Stone Abert was appointed trustee to make the same.

June 17, 1895, the trustee reported an offer by Allen C. Clark of $1,600 for one lot, and recommended its acceptance. The acceptance of the offer was also recommended by the committee, and on the same day the court made an order approving it. On June 25, 1895, Allen C. Clark filed his petition, setting out the purchase, but denying the jurisdiction of the court to order the sale, and offering to comply upon condition that a good title be made him. The court, holding that there was jurisdiction to order the sale and that the purchaser's title thereunder would be good, decreed its confirmation. From that decree Clark has appealed. There is no claim that the sale is necessary for the payment of the debts, or for the support of the lunatic, and the sole question for decision is, whether a court of equity in this District has jurisdiction to decree the sale of the land of a lunatic for the purpose of better investment.

The appellee contends that the jurisdiction is inherent, and also that it has been recognized and confirmed by the statutes of Maryland that are still in force in this District.

The compulsory conversion, or change of title, of property in this country, can only occur in certain exceptional cases. These may arise in the exercise of the right of eminent domain, in the course of sales under judicial process, or with respect to the property of infants and persons adjudicated to be *non compos mentis*, and who are by reason of their incapacity subject to the general control of the legislature and the supervision and guardianship of courts of equity or probate, as the case may be, within reasonable bounds.

Courts of equity in the District of Columbia may be said to possess the general jurisdiction of the court of chancery in England at the time of the Revolution, where not incompatible with the changed form and principles of government, or not altered by statutes since enacted.

There has been much discussion in this country of the extent of the inherent jurisdiction of equity over the estates of infants and lunatics (particularly the former), and the result has been a conflict of judicial decision. As regards the inherent power to decree the sale of an infant's real estate for the purpose of investment, the preponderance of authority would seem to be against it. 3 Pom. Eq. Jur., sec. 1309. But the question is of no importance here, having been provided for by statute. R. S. D. C., sections 957–968; *Thaw* v. *Ritchie*, 136 U. S. 519, 537, 544.

As regards this jurisdiction over the estates of lunatics, Mr. Pomeroy says:

" Whatever may be the correct theory with respect to the jurisdiction over infants, it is absolutely certain that the corresponding jurisdiction over the person and property of lunatics and idiots, and all others who may be adjudicated *non compos mentis*, was derived by delegation from the crown; it was a portion of the king's executive power as *parens patriæ*, and did not belong to the court of chancery by virtue of its inherent and general judicial functions. This branch of the regal authority was delegated to the

chancellor as the personal representative of the crown, by means of an official instrument called the sign manual, signed by the king's own signature, and sealed with his own privy seal, and was exercised by the chancellor alone, and not by the court of chancery. After this special jurisdiction had thus been exercised in any particular case, by adjudicating an individual to be a lunatic, and by appointing a committee of his person and property, a further jurisdiction then arose in the *court of chancery* to supervise and control the official conduct of the committee; but this supplementary jurisdiction of the *court* seems to have been a part of its general authority over trusts, trustees and fiduciary persons." 3 Pom. Eq. Jur., sec. 1311. See also 1 Spence Eq. 618; 2 Story Eq. Jur., secs. 1335, 1336; Adams' Eq. 290; *Dowell* v. *Jacks,* 5 Jones Eq. 417.

On this question, Lord ELDON said: "In the case of the infant the lord chancellor is acting as the court of chancery; not so in lunacy; but under a special, separate commission from the crown authorizing him to take care of the property and for the benefit of the lunatic." *Ex parte Phillips,* 19 Ves. Jr. 118, 122.

The matter of dealing with lunatics and their property seems to have been regulated, later, in England by statutes passed at various times. Adams' Eq. 292.

But the doctrine with respect to the original, inherent jurisdiction of the court of chancery remain unaltered. *Beall* v. *Smith,* 9 Ch. App. 85, 92. In that case, it was said: "It is to be borne in mind that unsoundness of mind gives the court of chancery no jurisdiction whatever. It is not like infancy in that respect. The court of chancery is by law the guardian of infants, whom it makes its wards. The court of chancery is not the curator either of the person or estate of a person *non compos mentis,* whom it does not and cannot make its ward. It is not by reason of the incompetency, but notwithstanding the incompetency, that the court of chancery entertains the proceedings. It can no more take upon itself the management or disposition of a lunatic's

property than it can the management and disposition of the property of a person abroad, or confined to his bed by illness." The court further proceeds to say : " If there be a trust property in which the person is beneficially interested, the court may, no doubt, deal with it in such manner as it may deem fit, and it will, if necessary, ascertain the nature and extent of his interest, and will authorize and, in a proper case, compel the trustee to deal with the lunatic's interest in the trust property for his benefit. But that arises from its inherent, absolute jurisdiction over trusts and trust funds."

After discussing the question at some length, Mr. Pomeroy states his conclusion as follows : " It necessarily follows from its origin, that this special jurisdiction over the persons and property of lunatics is not generally possessed by the courts of equity in the United States as a part of the original, inherent, equitable jurisdiction. There are a few apparent exceptions, but these exceptions in reality only confirm the truth of my statement." 3 Pom. Eq. Jur., sec. 1313.

This conclusion is supported by the fact that the matter of the control of the persons and estates of lunatics has been very generally, if not universally, regulated by statute in the several States, since a very early day. *Latham* v. *Wiswell*, 2 Ired. Eq. 294. It is so in Maryland ; and in the case in that State, and the one in this District, holding that a court of equity may decree a sale of a lunatic's estate for support and education, the authority was found in the statutes. *Estate of Doney*, 59 Md. 67 ; *In re Brent*, 5 Mackey, 352.

No case has been called to our attention where this inherent jurisdiction to order the sale of a lunatic's land for investment has been called into exercise in this country. It is true that Chancellor KENT, in an early case in New York, following certain English precedents, decreed the sale of timber on the land of a lunatic, where it was unquestionably to the advantage of the estate and worked no injury to the land itself. *In the Matter of Salisbury*, 3 Johns. Ch. 347.

This is probably one of the exceptional cases to which allusion was had by Mr. Pomeroy.   At a later period, however, another chancellor refused to decree a sale of land for investment, saying : " However desirable it may be, under peculiar circumstances, to sell the property of a lunatic in cases coming within the statute, it belongs to the legislature alone to afford the proper remedy."   *Matter of Pettit,* 2 Paige Ch. 596, 597.

In the Salisbury case, *supra,* the general jurisdiction of the court of chancery was apparently unquestioned, and was assumed as a matter of course.   The sole question of discussion was, whether the power to sell the timber was prohibited by the Statute of 17 Edward 2, which the chancellor said was in force in New York.   He then held, that as the statute only prohibited *waste,* it did not apply in the particular case.   He seems to have overlooked the origin and object of that ancient statute or ordinance, *de perogativa regis,* as it was called, whose date has generally been ascribed to 17 Edward 2, though modern research appears to have succeeded in tracing it, with more certainty, to the early years of Edward 1.   Hist. Eng. Law (Pollock & Maitland), vol. 1, 464.

It seems that the king, as *parens patriæ,* had, very early, wrested.the wardship of idiots from the lord of the fee and appropriated, as his own, all the revenues of their estate beyond the amount necessary for their sustenance.   Later, this wardship was extended to lunatics, and in each case the administration and care were delegated to the lord chancellor under the king's sign manual.   The statute, as Lord LOUGHBOROUGH said, was introductive of no new right in the crown, but declaratory only.   " The object was to regulate and define the prerogative and to restain the abuse of treating the estates of lunatics as the estates of idiots."   *Oxenden* v. *Compton,* 2 Ves. 71.   It provided, in substance, that their lands and tenements should be safely kept " without waste and destruction," and that the surplus revenues should be kept and delivered to them when re-

stored to right mind.   1 Spence Eq. 618 ;  Hist. Eng. Law (Pollock & Maitland ), vol. 1, 464.

It appears, therefore, that the statute was intended, not to restrict powers exercised by the court of chancery as such, for it had none ;  but to restrict the prerogative power of the crown, exercised by the chancellor, in person, under its special delegation.

It is true that when this delegation had once been made, some of the chancellors treated the administration as a trust to be executed, as well as supervised, by the court of chancery ;  but this practice was exceptional, and never became general, and the want of jurisdiction in the court, as distinguished from the lord chancellor, to control and dispose of the estate, came to be generally recognized.   This is shown, beyond doubt, by the fact that the appeal from an order of the chancellor, in such matters, was always to the king in council, and never to the House of Lords. Adams Eq. 290.

For additional light in this inquiry, we may advert to another and noted branch of prerogative power formerly exercised by the lord chancellor under the delegation of the crown, viz., certain trusts for the benefit of charities.   Here again, as has been remarked by Mr. Justice STORY, there has been much confusion, and it is not always easy to distinguish between the cases, wherein the chancellor acts as a judge, administering the common duties of a court of equity, and those wherein he acts as a mere delegate of the crown, administering its peculiar duties and prerogatives. 2 Story Eq. Jur., sec. 1189.

Referring to this state of confusion, Mr. Justice McLEAN said :  " There can be no doubt that decisions have been made in this country on the subject of charities, under the influence of English decrees, without carefully discriminating whether they resulted from the ordinary exercise of chancery powers, or the prerogatives of the crown.   The courts of the United States cannot exercise any equity powers except those conferred by acts of Congress and

those judicial powers which the high court of chancery in England, acting under its judicial capacity as a court of equity, possessed and exercised at the time of the formation of the Constitution of the United States. Powers not judicial exercised by the chancellor merely as the representative of the sovereign, and by virtue of the king's prerogative as *parens patriæ*, are not possessed by the circuit courts." *Fontain* v. *Ravenel,* 17 How. 369, 384.

As it is clear that this power to deal with the persons and estates of lunatics was a prerogative and not a judicial power, it could not have passed to, or become vested in, courts of equity in the United States.

"When this country achieved its independence, the prerogatives of the crown devolved upon the people of the States. * * * The sovereign will is made known to us by legislative enactments. And to this we must look, in our judicial action, instead of the prerogatives of the crown. The State, as a sovereign, is the *parens patriæ*." *Wheeler* v. *Smith,* 9 How. 55, 78.

However beneficial to the estate of the lunatic the exercise of the power in this case might be, we are compelled to say that it does not reside in the courts of this District, unless it may have been conferred by the statutes of Maryland in force at the time of the cession, or by acts of Congress since enacted.

This brings us to the inquiry whether the power to decree the sale may be found to have been thus conferred.

The earliest legislation on the subject provided merely for the execution of conveyances where the estate was held in trust, or by way of mortgage, or charged with a payment, or bound by an agreement to convey, the specific performance of which could be enforced. Act 1773, ch. 7, secs. 1 and 2; Compiled Stats. D. C., p. 75, sec. 7; Id., p. 79, sec. 15. See also provision for sale under mortgage. 1785, ch. 72, sec. 2; Compiled Stat., p. 81, sec. 22.

The same act of 1785 (section 6) confers general jurisdiction upon the chancellor "to superintend, direct and

govern the affairs and concerns" of lunatics, "both as to the care of their persons and the management of their estates;" to appoint committees and trustees, and "to make such orders and decrees respecting their persons and estates as to him may seem proper." Comp. Stat., p. 83, sec. 27.

It is unnecessary to consider whether these general words, if unlimited by others in the same and subsequent statutes, would be sufficient to confer the power sought in this case; for that they are so limited in their signification we think quite clear.

After these general words, in the same section, the special power is conferred to order the sale of personal property for the payment of debts, and when that is exhausted, of real property to an extent sufficient to complete the payment. Again section 12 authorizes the sale of a joint interest, or interest in common, of the lunatic with another person when to the advantage of all concerned. Comp. Stat., p. 85, sec. 33.

Under the broad meaning contended for the general words aforesaid, these last provisions would seem to have been wholly unnecessary.

That these words were not intended at the time, or understood afterwards, to have so comprehensive a meaning, becomes plainer when we turn to further provisions found in the acts of 1790 and 1800. Chapter 40, sec. 2 of the first mentioned act confers the power to sell personal property for conversion into money to be placed at interest, but limits the power to sell real property to so much as may be "necessary to support the lunatic or infant or to pay just charges incurred by the committee or trustee appointed." Comp. Stat., p. 80, secs. 18, 19.

Chapter 67, sec. 3, of the act of 1800, supplements the foregoing by providing that where a sale shall be necessary for support, and the property will not admit of division without prejudice, or is of such nature as to render it advisable and beneficial to sell the whole, or any greater part

than may be necessary for the immediate support of such person, the whole may be sold and the surplus proceeds invested.   Comp. Stat., p. 80, sec. 17.

It may be added that, in the foregoing provisions, infants are frequently included with lunatics by name, and that, as regards the former, full power to order the sale of their lands whenever to their benefit is given by the act of Congress of 1843, but lunatics are not included with them. R. S. D. C., secs. 957–968.   There is no other legislation on the subject.

Finding no warrant for the exercise of jurisdiction in the decree for sale under which this proceeding arose, either under the statutes or independently thereof, we must *reverse the decree appealed from, with costs to the appellant, and remand the cause to the court from whence it came, with direction to dismiss the bill, unless it may be amended so as to show a necessity for sale for support and maintenance.   And it is so ordered.*